[L. A. No. 2587.   Department Two.—April 7, 1911.]

THOMAS HIGGINS, Appellant, v. LOS ANGELES GAS AND ELECTRIC COMPANY (a Corporation), Respondent.

Order Granting New Trial—Specially Stated Ground for Granting —Denial as to Other Grounds—Sufficiency of Evidence Cannot be Considered on Appeal.—Where an order grants a new trial

on the sole ground that the court erred in allowing the jury to take
a certain exhibit with them into their consultation room, and denies
the motion as to all other grounds, on an appeal from the order
granting the new trial, the question of the sufficiency or insufficiency
of the evidence to support the verdict is eliminated from con-
sideration.

Jury.—Taking Exhibits During Deliberation—Discretion of Court
to Allow Exhibits to be Taken by Jury.—Section 612 of the
Code of Civil Procedure, authorizing the jury, upon retiring for
deliberation, to take with them all papers which had been received
as evidence in the cause, except depositions, is not to be construed
as a limitation of the discretionary power of the court to allow
other kind of exhibits to be taken, but as a modification and ex-
tension of the common-law rule touching exhibits containing writ-
ings.

Id.—Instruction as to Use of Exhibits.—The trial court may permit
the jury to take with them and use in their deliberations any ex-
hibit where the circumstances call for it, observing the proper pre-
caution of instructing the jury in the nature of the use which
they shall make of the exhibit.

Id.—Use of Exhibits by Jury—Experiments with Exhibits—Tak-
ing of Evidence by Jury.—The use of such exhibits by the jury is
governed by the fundamental rule that all evidence shall be taken
in open court, and that each party to a controversy shall have
knowledge of, and thus be enabled to meet and answer, any evi-
dence brought against him. They may use the exhibit according to
its nature to aid them in weighing the evidence which has been
given and in reaching a conclusion upon a controverted matter.
They may carry out experiments within the lines of offered evidence,
but if their experiments shall invade new fields and they shall be
influenced in their verdict by discoveries from such experiments
which will not fall fairly within the scope and purview of the evi-
dence, then the jury has been itself taking evidence without the
knowledge of either party.

Id.—When Court Should Instruct as to Use of Exhibits.—Where
from the nature of the exhibit it may be susceptible to improper use,
it is the duty of the court, by instructions to the jury, to limit and
restrict that use.

Id.—New Trial—Failure to Instruct as to Use of Exhibits—Ab-
sence of Injury.—A new trial should not be granted a defendant
against whom a verdict has been rendered, for failure to instruct
the jury as to the use they might make of an exhibit, when it
appears that no injury could have resulted to the defendant even if
the jury did perform an improper experiment with the exhibit.

Negligence—Injury to Leased Building—Landlord not Affected
by Tenant's Contributory Negligence.—A landlord is not re-
sponsible for the negligence of his tenant, and a landlord's right
of action to recover for injuries to the building leased, occasioned

by the negligence of a third person, is not defeated by the negligence of his tenant contributing to the injury.

ID.—VIEW OF PREMISES—CASUAL PASSING OF BUILDING BY JURY.—In an action to recover for the injuries to such building, the fact that the sheriff in charge of the jury, conducting the members to lunch, led them by an ordinary, natural and convenient route which happened to pass the plaintiff's building, will not warrant a new trial on the ground that the jury had inspected the building without the consent of the defendant, if the jury were not conducted past the building for the purposes of inspection, and it does not appear that they knew they were passing it, or that their attention was directed to it, and the building itself had been repaired at the time.

ID.—EXPERT TESTIMONY OF BUILDER—QUALIFICATION OF EXPERT.—In such an action, a contractor and builder of twenty-two years' experience who testifies that he knew the building before the explosion causing the injury, and examined it afterwards, sufficiently qualifies himself as an expert to admit his testimony as to the cost of repairing the building and the length of time it would take to restore it. If the defendant desired further information as to the extent of his knowledge he should have been examined to that end.

ID.—LOSS OF RENTS—REASONABLE TIME FOR RESTORATION OF BUILDING.—The plaintiff in such action is entitled to recover the loss of rents occasioned by the defendant's negligence up to the time when he could with diligence have restored the building, whether in fact he ever restored it or not.

APPEAL from an order of the Superior Court of Los Angeles County granting a new trial.   Charles Monroe, Judge.

The facts are stated in the opinion of the court.

J. Wiseman Macdonald, and Thomas P. Higgins, for Appellant.

Gibson, Trask, Dunn & Crutcher, W. A. Cheney, and L. M. Edwards, for Respondent.

HENSHAW, J.—This action was brought to recover damages from defendant for injuries caused to a building, the property of plaintiff. The damage was caused by an explosion of gas. This explosion occurred in a restaurant of a tenant of the plaintiff, Cressaty by name. The facts attending the explosion have recently been set forth by this court in its consideration of the case of *Merrill* v. *Los Angeles Gas and Electric Company,* 158 Cal. 499, [139 Am. St. Rep. 134, 111

Pac. 534]. It is sufficient to refer to that case, but it is to be borne in mind that that action was for personal injuries occasioned to a patron of Cressaty's restaurant, while the present action is to recover damages occasioned to plaintiff's building. while in the possession of a tenant.

Trial was had before a jury. The defendant, as part of its evidence, showed that the gas leak being in a dark and obscure place, its employees approached the leak with an electric flash light and while the man holding the flash light was in close proximity to the leak the explosion occurred. The flash light used to inspect the leak was never recovered. It was probably destroyed by the explosion. But a similar flash light was introduced in evidence by the defendant and the contention was made that it was impossible for this flash light as used to give out any spark which would cause the ignition and explosion of the gas. It was also in evidence that an oil stove in the restaurant was burning at the time of the explosion and that this oil stove was some forty-four feet from the place where the gas was escaping. It was contended by plaintiff that the explosion was probably occasioned by a spark from the electric flash light and he introduced evidence to establish the fact that a flash light such as that before the jury could produce a spark. It was contended by defendant that the explosion was occasioned by the flame of the oil stove and that Cressaty, plaintiff's tenant, was negligent in not having extinguished the light of the stove after demand by defendant's employees that he do so. To demonstrate that the flash light could give out, and might have given out, a spark sufficient to cause the explosion, plaintiff in rebuttal of the evidence of defendant's experts to the contrary, put an expert witness on the stand who so testified. Asked to demonstrate before the jury how the spark could be produced and to produce it, he proceeded to unscrew the cap of the flash light and undertook to make a spark by the use of a pair of pliers. Under objection the court stopped this experiment, manifestly for the reason that to be of value to the jury, a spark should be produced from the flash light under conditions of use like those attending the explosion. Argument was indulged in before the jury *pro* and *con* over the possibility of so producing a spark, and the flash light was passed from hand to hand and inspected by the jury. While deliberating over their verdict

the jury requested to have with them in the jury room the flash light. The court permitted them to do so. Special interrogatories were submitted to the jury, amongst them one in answer to which it declared that the explosion was caused by a spark from the flash light and not from the flame of the oil stove. The general verdict was for plaintiff. Defendant moved for a new trial. The court denied the motion as to all grounds save one, and granted the new trial "on the sole ground that the court erred in sending in to the jury in their consultation room the flash light." The terms of this order eliminate from consideration the question of the sufficiency or insufficiency of the evidence to support the verdict. (*Kauffman* v. *Maier*, 94 Cal. 270, 18 L. R. A. 124, [29 Pac. 481]: *Siemsen* v. *Oakland etc. Ry. Co.*, 134 Cal. 496, [66 Pac. 672].) There are left for consideration two matters: 1. Was it error calling for a new trial for the court to have permitted the jury to take with them to their room and to have with them during their deliberations the flash light introduced in evidence by respondent; 2. Alleged errors of the court arising in the trial of the case.

The only express provision of the law bearing upon the right of juries to use exhibits or upon the right of the court to permit juries to use exhibits in their deliberations is found in section 612 of the Code of Civil Procedure, and this has to do solely with "papers" which have been introduced in evidence. One curious in such matters can learn from the common law why this section of the code was adopted and why also it is confined to papers. The common-law rule was that jurors were allowed to take with them in their deliberations only such instruments as were under seal and that they were not permitted to take with them any unsealed papers excepting by consent of the parties. The reason for this, according to Lord Hale and Lord Gilbert, was that jurors were supposed to be, and for the most part were, unlettered men. They could not read. A writing conveyed to them nothing. But in the case of sealed instruments, as these jurors were drawn from the vicinage, they were quite apt to be familiar with the armorial bearings of their neighborhood great from which the seals were derived. An instrument under seal, therefore, spoke for itself and the jurors were permitted to take such instruments with them, not for the purpose of reading the instrument

itself, but rather for the purpose of verifying their recollection of the seal and testing its genuineness. The curious inquirer will also find that it was not uncommon for one who had not risen to the dignity of possessing an armorial bearing to set the stamp of his teeth as his seal upon the instrument, and, hence, the old-time phrase of "proving it to (by) his teeth." But in the case of other exhibits not involving a knowledge of reading or writing, it seems to have been a matter of discretion with the court to allow the jury to take them into the jury room in aid of their deliberations. This rule, as to papers, however, was in force at a time when learning in letters was so rare and the premium upon such learning so high that a felon could save his neck by proving his ability to read a verse of scripture. It was to save the possibility of the question arising in this state as in 1812 it arose in the state of Pennsylvania (*Alexander et al.* v. *Jameson et al.*, 5 Binn, 238) that the section of the code was adopted. All distinction between sealed and unsealed instruments had been abolished, and as the restrictive rule of the common law upon the power of the court had gone only to papers containing printing or writing, it was necessary only to modify that rule as was done by section 612. Therefore, section 612 is not to be construed as a limitation of the power of the court in the matter of other exhibits but as a modification and extension of the common-law rule touching exhibits containing writings.

It will be noted that depositions are excluded by the section. This is for the very obvious reason that depositions may, and usually do, contain matters not admissible in evidence which matters have been eliminated from the consideration of the jury. To permit the jury to take depositions with them would be to put them in possession of this excluded evidence. In this lies the suggestion of the true rule guiding the court and governing the jury in the use of exhibits. The court may permit the jury to take with them and use in their deliberations any exhibit where the circumstances call for it, observing the proper precaution of instructing the jury in the nature of the use which they shall make of the exhibit. It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern

the use of such exhibits by the jury. They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain.

Typical instances of the improper and proper experimental use of exhibits by a jury are found, respectively, in *Wilson* v. *United States,* 116 Fed. 484, [53 C. C. A. 652], and *Taylor* v. *Commonwealth,* 90 Va. 109, [17 S. E. 812]. In the first of these cases the indictment charged the defendant with smuggling opium "prepared for smoking purposes." A sealed can had been introduced in evidence by the prosecution and asserted to contain a sample of the smuggled opium. No testimony was given tending to show that the can contained opium prepared for smoking purposes, and yet it was conceded that it was essential to a conviction (since the offense was so laid) to show not only that the can contained opium and that it was smuggled opium, but also that it was opium "prepared for smoking purposes." In this condition of the evidence the court instructed the jury that it might take the can to the jury room, open it and extract some of the contents; that they would not be permitted to make a chemical examination of the contents, but that they could in the jury room test the extracted samples and learn to their satisfaction whether or not it would burn, and use the information so obtained in determining whether the can contained "opium prepared for smoking purposes." The circuit court of appeals in holding this instruction to be erroneous, said: "Surely, if the attorney for the government, as was his duty, had offered evidence going to show that the can in question contained opium for smoking purposes, the defendants would have been legally and justly entitled to have proved, if they could, that it contained no such thing; in which latter event there must have been a verdict of not guilty, for there was nothing else offered tending to show that there was any opium prepared for smoking

purposes in the case. Yet the jury was left to determine that essential fact for themselves, by experiment, and in the absence of the defendants, who were thus wholly deprived of the opportunity to contest the correctness of the jury's experiments, and of the possibility of giving any evidence upon one of the essential facts involved in the prosecution." *Taylor* v. *Commonwealth* was a case of murder. It was the assassination from ambush at midday of six or seven innocent and unsuspecting people. By the supreme court of Virginia it is described as "an inhuman and wholesale massacre of innocent and unsuspecting men, women and children traveling peaceably upon the public highway." In the ambuscade of the assassins were found certain cartridge shells which had been discharged from a 45-75 Winchester rifle. Defendant was charged with this murder. It was shown by the prosecution that he carried a rifle of this description and caliber. The defendant introduced his rifle in evidence and with it four empty shells which he proved were fired from his rifle. It was contended that the marks of the firing pin upon the cartridge shells found in the ambuscade were so different from the marks of the firing pin upon the shells introduced by the defendant in evidence as to establish to a certainty that the shells found in the ambuscade were not fired from defendant's rifle. During the trial the rifle admitted in evidence was inspected by the jury but was not taken to pieces. After retiring to deliberate the jury asked if the gun could be sent to them. This was done without objection from either side. After verdict of guilty defendant moved in arrest of judgment, contending that the jury had improperly taken the gun to pieces and examined the plunger or firing pin. It was shown in support of the motion that the jury had actually done this thing and that from their examination had concluded that the plunger or firing pin had been tampered with. The supreme court of Virginia very properly upheld the verdict, the conduct, and the experiment of the jury. The purpose of the introduction of the gun in evidence was to show that its firing pin did not strike the cartridge in a particular way. The gun was offered by the defendant to establish his contention in this regard. A more acute prosecuting attorney might have caused the examination to have been made in open court and thus have demonstrated the trick and fraud, but

his failure to do so afforded no ground for overthrowing the verdict of an intelligent and scrutinizing jury which, making its own examination of the evidence admitted to prove or disprove the very fact, discovered that the plunger "had been recently tampered with and fixed for the occasion of the trial." These cases, we have said, are typical. In the one the jury was permitted to make an experiment without knowledge to the parties of the method or process which were employed. It was an experiment addressed to evidence necessary to the prosecution's case which should have been offered in court. To permit the jury to gather this evidence without the presence of the defendant and without the possibility of knowledge upon his part as to the method by which their conclusion was reached and without the possibility of contesting the correctness of their experiment was, as the court justly held, the equivalent of the taking by the jury of evidence out of court, and a deprivation of the constitutional right of the defendant to be present at the taking of all evidence in his case. Upon the other hand, in the Virginia case the jury was not experimenting along lines without the evidence. It merely subjected an exhibit to a more critical examination than had been made of it in court and by such examination reached a conclusion upon a contested fact by a more careful scrutiny of an exhibit introduced for the very purpose of affording evidence of the fact.

In this state it was held in *People* v. *Conkling,* 111 Cal. 616, [44 Pac. 314], that it was error demanding a new trial, when certain of the jurors, to satisfy themselves at what distance a rifle discharged would powder-mark cloth, procured a rifle out of the court room and experimented with it. Here was a clear case of the jury's obtaining evidence by unauthorized experiments made without the presence and knowledge of the defendant. But on the other hand, in *People* v. *Mahoney,* 77 Cal. 530, [20 Pac. 73], clothing worn by the deceased at the time of the homicide was upon the jury's request sent to the jury room, and in the matter of the *Thomas Estate,* 155 Cal. 488, [101 Pac. 798], it was held that a memorandum book admitted in evidence was properly allowed in the jury room in aid of the jury's deliberations.

In most of the cases, because of the very nature of the exhibit and of all the possible uses to which it may be put in the

jury-room, there is no occasion for the court to admonish the jury or to caution and limit it as to the nature of the use or experiment which shall be made. But where from its nature, it may be susceptible to improper use, as in the case of the can of opium, it is the duty of the court, by instruction to the jury, to limit and restrict that use.

Coming to the case at bar, it is certain that the trial judge conceived that he had fallen into error in allowing the jury to take with them and to experiment with an exhibit which they might subject to an improper use, without limiting the scope of their experiments by proper instruction. It will be remembered that the judge checked one experiment in the court-room during its progress, and it is probable that he thought that by delivering the exhibit to the jury he had prepared the way for them to perform the very experiment which he had forbidden. Since a jury is not allowed to impeach its verdict by showing what improper methods it employed to reach it, the need of such cautionary instructions in a proper case becomes imperative, and we would by no means disturb the ruling of a trial court granting a new trial if it appeared that injury resulted from its failure to give such instructions.

But if, on the other hand, it could not have resulted in injury to the defendant even if the jury did perform an improper experiment and from it reached its conclusion that the explosion of gas was caused by a spark from the flash light, then clearly no new trial should be granted for an error which could not have resulted in injury. To this consideration we now come.

The special verdict that the explosion was caused by a spark from the flash light was not material to the case, and defendant's position would not have been bettered if the jury had found that the cause of the explosion was not the spark from the flash light, but the fire from Cressaty's stove. It is to be remembered that this is not Cressaty's action to recover, which might be defeated by proof of his own contributory negligence. It is the action of his landlord, and, unless it can be said that the landlord was responsible for the negligent act of the tenant so as to defeat the landlord's recovery, the statement just made is unanswerable. Upon this proposition something of what was said by this court in *Merrill* v. *Los Angeles G. & E. Co.*, 158 Cal. 499, [139 Am. St. Rep. 134, 111 Pac.

534], is applicable.  We are not cited to any authority supporting respondent's position that a landlord would be responsible for the tenant's negligence, and, indeed, the rule is directly to the contrary.  "Deplorable, indeed, would be the situation of landlords if they were liable to be harassed by actions for the culpable negligence of their tenants." *(Cheetham* v. *Hampson,* 4 D. & East. 319; see, also, *Kalis* v. *Shattuck,* 69 Cal. 594, [48 Am. Rep. 586, 11 Pac. 346]; *White* v. *Montgomery,* 58 Ga. 204; *Batterman* v. *Finn,* 32 How. Prac. (N. Y.) 502.)  Since the landlord is not responsible for the negligence of the tenant proof of that negligence could not be used to defeat his recovery for injuries to his property, and thus, if it were established that the negligence of the gas company, running concurrently with the negligence of the tenant, united to produce the injury to the property, the landlord would have his recourse against both or either for the reasons given in *Merrill* v. *Los Angeles G. & E. Co.,* 158 Cal. 499, [111 Pac. 534].  Therefore, in this case, the finding that the spark from the flash light caused the explosion, even if erroneous, or if erroneously arrived at, could not have worked injury to the defendant.

It is next urged that the court erred "in taking the jury during their deliberations, and without the consent of the defendant or its attorneys, past the building which was damaged, and thereby affording said jury an opportunity of viewing said premises."  The evidence upon this point discloses merely that the sheriff in charge of the jury, conducting the members to lunch, led them by an ordinary, natural and convenient route which happened to pass plaintiff's building.  This was the only way in which the court "took the jury."  The jury was not conducted past the building for the purpose of inspection.  It does not even appear that they knew they were passing the building, much less that their attention was directed to it.  The building itself had been repaired at the time and the circumstance was of so trifling a character that even if the case had been criminal it would not be a ground for disturbing the verdict.  Thus Wharton lays it down that a mere casual visit of the jury to the scene of the *res gestæ,* as where the jury when taking exercise under the custody of an officer walked by such scene, is no ground for setting aside the verdict.  (Wharton on Criminal Plead.

and Prac., 9th ed., sec. 834.) The proposition is fully supported by authority, and, certainly, the rule would be no more rigid in a civil case than in a criminal.

The measure of damages touching loss of rents was accurately given to the jury. *(Linnforth* v. *San Francisco G. & E. Co.,* 156 Cal. 62, [103 Pac. 320].) It was in evidence that it would take from sixty to seventy-five days to restore the building to its condition before the explosion. It was shown that the rental value of the destroyed building amounted to seven hundred dollars a month. The jury's award for loss of rents was $1264.75 and it was within the evidence. Mr. Rebman qualified as an expert of twenty-two years' experience as a contractor and builder. He testified that he "knew the building known as numbers 114-116-118 West Second Street prior to February 13, 1907, and had examined the building after the explosion." His testimony as to the cost of repairing the building and the length of time it would take to restore it, it is said, was inadmissible in that it was not shown that he had sufficient knowledge of the character of the building before the explosion. He did, however, testify that he knew the building before the explosion and examined it afterward. Here was sufficient upon which to predicate his expert testimony and if defendant desired more elaborate information as to the extent of his knowledge he should have been examined to that end.

The court instructed that the plaintiff was entitled to recover such an amount as the jury might find that "he really lost in rents by reason of the premises being destroyed by the explosion during such time as it would take with reasonable diligence to repair such building." It is urged that as the building was originally two stories in height and that the plaintiff had rebuilt it to but one story in height, and "as plaintiff never intended to restore the second story" it was error for the court to allow the plaintiff to recover as damages the rent lost during such time as it would take with reasonable diligence to restore it. We think respondent herein misconstrues the true meaning of the rule of damages. Plaintiff is not entitled to recover only in the event that he proposes to restore the building to its former condition. He had a two story building with a certain rental value until it was injured through the negligence of the defendant and he was

entitled to recover his loss of rents occasioned by that negligence up to the time when he could with diligence have restored the building, whether in fact he ever restored it or not.

This answers all of the grounds urged by respondent in support of the court's order granting a new trial. None of them, as we have undertaken to show, is tenable, and for the reasons given the order granting a new trial is reversed.

Lorigan, J., and Melvin, J., concurred.

Hearing in Bank denied.