[Crim. No. 32874. Second Dist., Div. Five. Aug. 6, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONARD COOPER, Defendant and Appellant.

846

■■■■■■■■

## COUNSEL

Nasatir, Sherman & Hirsch and Paul L. Gabbert for Defendant and Appellant.

George Deukmejian, Attorney General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Patricia D. Benke, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—A jury convicted defendant of possession of heroin for sale (former Health & Saf. Code, § 11351, subd. (a)) and also found that he possessed more than one-half ounce of a substance containing heroin (Pen. Code, § 1203.07). His motion to strike the Penal Code section 1203.07 finding was denied and he was sentenced to state prison for the term prescribed by law. He appeals from the judgment.

### FACTS

On February 1, 1977, at about 12:45 p.m., Los Angeles Police Officers Gregg Tutterrow and John Rowe were driving north on Corning Street near Cadillac Avenue in Los Angeles at a speed of two to three miles per hour. Defendant was walking on Corning Street next to a man later identified as Ernest Kidd. Defendant looked over his left shoulder in the direction of the police vehicle, walked a little further and then looked over his shoulder again. He then reached toward the waistband of his pants and tossed a shiny object about 15 feet away onto the lawn of a residence.

Tutterrow stopped the police car and Rowe got out, took out his badge, said he was a police officer and told the two men to stop. Defendant did not stop until Rowe repeated the order. While Tutterrow stayed with the two men, Rowe went and retrieved the item thrown by defendant. It was a cellophane bag containing what later proved to be heroin.

Defendant was placed under arrest. A later booking search revealed three $100 bills tucked in his left sock and about $68 in his pocket.

The cellophane bag contained 22 grams of a chocolate brown substance. At trial, a police narcotics expert testified that in his opinion the substance was 40 to 50 percent pure heroin which could be cut several times to yield 352 grams of "street pure" (2 to 4 percent) heroin. The value of that amount of cut heroin would be between $8,800 and $17,000. The expert concluded that the heroin had been possessed for purposes of sale rather than for personal use.

Testifying in his own defense, defendant denied that he had either possessed or thrown the heroin. He was in the bedspread business and was on Corning Street on February 1 to measure a bed for a woman who wanted him to make a bedspread for her. He did not know Mr. Kidd but was walking past him on the street when the officers stopped him. He did not see Mr. Kidd throw anything.

Defendant testified that he kept the money in his sock to avoid being robbed. He did not use heroin and before the incident did not know what it was.

A character witness who had known defendant since 1972 testified that he had an honest reputation and that he had never known him to be involved with drugs or with people who used drugs.

More facts will be added where pertinent.

## DISCUSSION

### 1. Prosecutorial Misconduct in Opening Statement.

██ Defendant claims that the deputy district attorney engaged in prejudicial misconduct because the People's expert witness testified that the "street value" of the heroin was between $8,800 and $17,000 while during his opening statement the prosecutor apparently had told the jury

that he would show that the value was between $8000 and $34,000 or $35,000.[1] We find no prejudicial error. Even if the jury had been misled as to the upper figure, it does not appear that that fact would have affected the verdict since it seems unlikely that the allegation that a quantity of heroin evaluated at any of the figures provided would have been possessed merely for personal use. In any event, the jury was clearly instructed that it "must not consider as evidence any statement of counsel made during the trial; . . . ." In light of that admonition and the evidence, any misconduct was undoubtedly harmless.

### 2. Refusal of Prosecutor to Stipulate to Polygraph Results.

Defendant next argues an abuse of prosecutorial discretion in that the district attorney refused to stipulate to the admission of the results of a polygraph examination because of a "policy" against such stipulations. The point is without merit. We have catalogued elsewhere the serious problems of reliability inherent in the process of polygraphy. (*People* v. *Adams* (1975) 53 Cal.App.3d 109, 115-118 [125 Cal.Rptr. 518].) We cannot fault the district attorney for responding to those difficulties by refusing, as a matter of policy, to stipulate to the admission of polygraph test results.

### 3. Denial of Hitch Motion.

Relying on *People* v. *Hitch* (1974) 12 Cal.3d 641 [117 Cal.Rptr. 9, 527 P.2d 361], defendant argues that the court erred in denying his motion to suppress the plastic bag containing heroin. The motion was based on the allegation that the police had destroyed potentially favorable fingerprint evidence because "the officers handled [the] bag without any gloves on" and because there was no attempt by the police to lift latent fingerprints from the bag.

The principles of *Hitch* are simply inapposite to the instant case. In the first place, there is nothing in *Hitch* which affirmatively requires the police to employ specific investigative techniques such as the lifting of latent fingerprints. (Cf. *People* v. *Beagle* (1972) 6 Cal.3d 441, 450-451 [99 Cal.Rptr. 313, 492 P.2d 1].) In the second place, there was not the slightest showing that any evidence was effectively "lost" to the defendant. (See

---

[1]Although the opening statement itself was not made part of the record on appeal, the record does reflect a motion for mistrial made by defense counsel on the ground that the prosecutor had erroneously told the jury that the value would be shown to be up to $35,000. The deputy district attorney did not deny the claim but stated that he "had a ballpark figure of $8000 and $34,000."

*People* v. *Hitch, supra,* 12 Cal.3d at p. 649.) The mere fact that Officer Rowe touched the bag with his bare hands does not lead ineluctably to the conclusion that other fingerprints on the bag were destroyed. Defendant offered no evidence that any attempt had been made by the defense to lift fingerprints from the bag. The contention that evidence was destroyed by the police is pure speculation.

### 4. *Refusal of Requested Instruction on Identification Evidence.*

■ Defendant requested an instruction tying the accuracy of the witness' identifications of him to the reasonable doubt standard of proof. (See *People* v. *Guzman* (1975) 47 Cal.App.3d 380, 387 [121 Cal.Rptr. 69].) He now claims that the trial court's refusal to deliver that instruction was reversible error. There was no error. Defendant's identity was never in issue; the only question was whether he had or had not possessed the heroin. Even if the concept of "evidence of identification" could be stretched to fit the facts of this case, the error in refusing the instruction was clearly harmless in light of the trial court's delivery of instructions on credibility of witnesses (CALJIC No. 2.20) and the People's burden of proving defendant's guilt beyond a reasonable doubt (CALJIC No. 2.90). (See *People* v. *Guzman, supra,* 47 Cal.App.3d at p. 388.)

### 5. *Motion for New Trial.*

Defendant moved for a new trial on a number of grounds. He now claims that the trial court abused its discretion in denying the motion on two of the stated grounds—newly discovered evidence and juror misconduct.

### A. *Newly Discovered Evidence.*

■ In an affidavit attached to the motion for new trial, defense counsel declared that defendant had forgotten the names of two witnesses who could corroborate his testimony that the reason he was in the area where he was arrested was to visit a customer of his bedspread business. It was not until after the jury had returned its verdict that defendant called his lawyer to tell him that he had located the witnesses. Defense counsel called the two witnesses to testify at the hearing of the motion. Leonard Maree testified that in the early part of January 1976, he had recommended to a woman named Pat Fisher that she employ defendant to make a bedspread for her. He had "a brief contact" with defendant in the fall, 1977, and did not see him again until he inadvertently met him

on the street in March of 1978.[2] Ms. Fisher testified that she had had an appointment with defendant on or about February 1, 1977. He was supposed to come to her house, which was near Corning Street, but he never showed up.

■ The central question in the determination of whether a new trial should be granted on the ground of "newly discovered evidence" is whether that evidence would probably result in a different verdict upon retrial. (See *People* v. *Beyea* (1974) 38 Cal.App.3d 176, 202 [113 Cal.Rptr. 254].) That is a question which normally can best be answered by the trial judge, who has been witness to the presentation of all the evidence at trial. Consequently, the trial court's determination that a new trial should not be granted may be disturbed only where it is shown that there had been an abuse of discretion—as, for example, where the "newly discovered evidence" contradicts the strongest evidence introduced against the defendant. (See *People* v. *Williams* (1962) 57 Cal.2d 263, 274-275 [18 Cal.Rptr. 729, 368 P.2d 353].)

■ The new evidence presented here is of no such magnitude. That evidence simply corroborated the defendant's story that he had a legitimate reason for being in the area where he was arrested. However, there is nothing inconsistent between that fact and the fact that defendant possessed the heroin at that time. We find no abuse of discretion.

### B. Juror Misconduct.

■ Also attached to the motion for new trial was an affidavit of juror Ute M. Kelley. Ms. Kelley recounted three "incidents" which defendant claims were juror misconduct which required the grant of a new trial: (1) during the trial, Ms. Rowe drove her car by some pedestrians and "estimated whether or not a person seated in a moving car could make the observations testified to by the police officers" from which she "concluded" that the officers' testimony was credible; (2) during jury deliberations, the jurors "reenacted" defendant's throwing of the plastic bag and based upon the reenactment they "confirmed . . . the police officers' testimony and in court demonstration" of the throwing incident and (3) during trial several jurors saw defendant driving a Cadillac El Dorado into the court parking lot, which prompted one juror to say, "Well, look at that an El Dorado no less" and another juror to say, "Oh my God, I just saw that guy . . . get out of an El Dorado."

---

[2]The jury returned its verdict on March 9, 1978.

A new trial may be granted on the ground that the jury "has received any evidence out of court, other than that resulting from a view of the premises, or of personal property." (Pen. Code, § 1181, subd. 2.) ■ The determination of jury misconduct is addressed to the sound discretion of the trial court. (*Bardessono* v. *Michels* (1970) 3 Cal.3d 780, 795-796 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) ■ However, the extent to which jurors can impeach their own verdict is severely circumscribed. Thus, while jurors are permitted to testify to "overt acts, objectively ascertainable" they may not address themselves to "the subjective reasoning processes of the individual juror, which can neither be ·corroborated nor disproved, . . ." (*People* v. *Hutchinson* (1969) 71 Cal.2d 342, 349 [78 Cal.Rptr. 196, 455 P.2d 132]; *Krouse* v. *Graham* (1977) 19 Cal.3d 59, 80-81 [137 Cal.Rptr. 863, 562 P.2d 1022]; Evid. Code, § 1150.)

■ The first "incident" to which Ms. Kelley referred clearly falls within the category of subjective mental processes. The juror's mental processes of "estimating" distances and "concluding" that the officers were credible are in no way objectively verifiable. The only fact which could be verified—that she drove her car—obviously does not constitute misconduct.

■ On the other hand, the alleged reenactment of defendant's disposal of the contraband was an overt act which could properly be testified to by the juror. Defendant argues that the reenactment amounted to an impermissible experiment conducted by the jury outside of the presence of the parties and their counsel. (See *People* v. *Conkling* (1896) 111 Cal. 616, 627-628 [44 P. 314].)

It is clear, however, that experiments by the jury are prohibited only where the result is the production of "new" evidence. (Witkin, Cal. Criminal Procedure (1963) § 520, p. 530.) ■ Our Supreme Court has stated the rule as follows: "[The jury] may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain." (*Higgins* v. *L.A. Gas & Electric Co.* (1911) 159 Cal. 651, 657 [115 P. 313].) The general rule is that the jurors may engage in experiments which amount to no

more than a careful examination of the evidence which was presented in court. (See Annot. (1964), 95 A.L.R.2d 351, and cases cited therein.)

■ The experiment in the present case did not result in the generation of new evidence. (Cf. *People* v. *Conkling, supra.*) During the trial, Officer Rowe had demonstrated the manner in which defendant had thrown the contraband. The jurors simply repeated the officer's reenactment. Nothing requires that the jury's deliberations be entirely verbal, and we would expect a conscientious jury to closely examine the testimony of the witnesses, no less so when that testimony takes the form of a physical act. There was no error in denying the motion for new trial on this ground.

■ The final allegation of juror misconduct—the statements about defendant driving a Cadillac—were also objectively verifiable. However, the determination whether the statements affected the outcome of the trial was within the discretion of the trial judge. (*Bardessono* v. *Michels, supra.*) There was evidence that defendant owned two businesses—the bedspread business and a towing business. To assume that the jurors' statements affected the verdict would be pure speculation. Consequently, we find no abuse of discretion on the part of the trial court.

### 6. Validity of Penal Code Section 1203.07.

This matter was orally argued a few weeks before the Supreme Court decided *People* v. *Tanner* (1979) 24 Cal.3d 514 [156 Cal.Rptr. 450, 596 P.2d 328] (*Tanner II*). Defendant has filed a supplemental brief in which he presents various sophisticated arguments to the general effect that *Tanner II* does not mandate a denial of probation in his case.[3] Try as we might, we are unable to distinguish the mandatory language of Penal Code section 1203.06 from the identical language in section 1203.07. We therefore hold that the trial court correctly considered itself bound by the latter statute.

### 7. Application to Produce Evidence on Appeal.

■ Concurrently with his brief attempting to distinguish *Tanner II*, defendant has filed an application to produce additional evidence on appeal: In this application he requests that we authorize a quantitative

---

[3]He argues: (1) *Tanner II* is only a dictum, even as far as section 1203.06 of the Penal Code is concerned; (2) we should not follow *Tanner II* because the lead opinion is poorly considered; and (3) we should, at least, say something nasty about *Tanner II*.

chemical analysis of the heroin involved in this case. The application has no merit whatever. As noted, during the trial an expert officer expressed the view that the heroin in question was "somewhere around forty or fifty percent pure. . . ." This opinion was based on the condition and color of the substance involved. After cross-examination by defense counsel exposing certain weaknesses in the officer's opinion, the People moved for a "qualitative analysis."[4] The motion was successfully opposed by the defense.

The obvious reason for defendant's change of heart is the hope that a quantitative analysis will reveal that the contraband contained less than one-half ounce of "pure" heroin. This would then be the basis for an argument that Penal Code section 1203.07 does not apply, after all. Defendant's problem, is however, that as long as *People* v. *Solorzano* (1978) 84 Cal.App.3d 413 [148 Cal.Rptr. 696] remains the law, the argument would be fruitless. The application is denied.

Affirmed.

Ashby, J., and Hastings, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 11, 1979.

---

[4]Counsel obviously meant "quantitative." That a qualitative analysis had already disclosed that the contraband in question consisted of "22 grams of a substance containing heroin . . ." was stipulated to at the trial.