Filed 3/17/14  Hull v. Phelps CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| JOHN M. HULL,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>MICHAEL PHELPS,<br><br>    Defendant and Respondent. | 2d Civil No. B243383<br>(Super. Ct. No. 56-2011-<br>00389287-CU-PO-VTA)<br>(Ventura County) |

Plaintiff sued a property owner for personal injuries that occurred when a dog owned by the property owner's tenants bit him.  A jury returned a verdict for defendant property owner.  Plaintiff appeals on the grounds of jury misconduct and the trial court's refusal to instruct on nondelegable duty.  We affirm.

FACTS

Michael Phelps owns property in Ventura on which there are two houses.  Phelps rented the front unit to to Charles Warnock.  Warnock lived there with his wife and daughters.

In September 2008 Phelps rented the back unit to Kevin Lennon and Cecilia Jones.  The rental application asked about pets.  Lennon and Jones listed "Dog/American Staffordshire."  Phelps did not know that an American Staffordshire is a pit bull.  The lease allowed for one dog.

After Lennon and Jones moved in, the dog they owned at the time of the application died. They acquired a new pit bull puppy they named Cholo. Cholo grew to weigh 100 pounds.

At some point, Cholo bit Warnock. The bite was not serious, and Warnock did not report it to Phelps, hoping it would not happen again.

In October 2010 Warnock's wife left a message on Phelps's answering machine informing him that a pit bull bit Warnock "again." Warnock's wife also mentioned that Lennon had constructed a white gate across the driveway, and that they had to go through the gate to get to the garage.

Phelps drove by his property and saw the gate across the driveway for the first time. He did not approve the gate or that a pit bull lived there. He wrote a letter to Lennon and Jones stating that he had been advised that Lennon's dog had bitten someone. The letter stated that "any animal not on the rental agreement" must be removed from the premises and the gate must also be removed. Phelps did not believe the dog that bit Warnock was on the rental agreement.

After Phelps wrote the letter, he talked to Lennon and Jones on the telephone. They told Phelps that they would take care of the dog problem and that they had "somewhere for the dog to go." Phelps assumed that they were giving the dog away.

About two weeks later, Phelps drove by the property and saw that the gates across the driveway had been removed. He assumed that the dog had been given away. In fact, the dog was still present.

On November 16, 2010, John Hull entered the property to deliver keys and a repair estimate to Lennon and Jones. Without warning Cholo attacked Hull, injuring his arms and hands.

*Juror Affidavit*

The jury found Phelps not negligent by a margin of nine to three. Hull moved for a new trial based on juror misconduct. In support of his motion, he submitted a declaration by Jury Foreman, Robert Gold, as follows:

2

"When the jury began its[] deliberations we went around the room and each juror was able to express their position and feelings on the case before us. When the jury first voted, the vote was 7-5 for the defense. At the initial go round, Juror number 6, a man named 'Alexander' who I believe is a CPA for Bank of America, proposed that the case be resolved by the use of mathematical probability calculations and that he 'had it all figured out'. As I recall, Alexander prepared and utilized a cross-graph in his note book which he used and passed around the jury room stating to the other jurors that they should use numerical probability calculations to decide the essential facts in the case. In preparing the graph, as described by Alexander, he assigned numerical values to several of the key facts in the case. For example, he stated that to determine who was recalling the facts correctly, a % of truth could be determined by use of the mathematical formulas which he was proposing. Alexander said that mathematical probabilities could 'prove' the probabilities of the essential facts in the case and in his view, the result of his calculations favored the defendant.

"I became extremely concerned when Alexander continued to press the other jurors with his mathematical probability calculations. Alexander sated that 'there was no question that the defendant, Mr. Phelps, was recalling the facts more accurately than the plaintiff based upon his (Alexander's) calculations of probability'. In response to Alexander's statements, I stated to the other members of the jury that 'we as the jury should follow the jury instructions and focus on the evidence and the law before us and that consideration of Alexander's probability calculations was not proper.' I directly stated to Alexander that it was 'inappropriate to use mathematics to formulate a legal decision in this case'.

"On the morning of the second day of deliberations, the jury voted again and the jury voted 12-0 that the plaintiff deserved some compensation for his injuries. Because of this vote, I stated to the Judge that 'there was light at the end of the tunnel'. After this vote was taken we turned our attention to Question No. 1. Was Defendant Michael Phelps Negligent? At this time, Alexander again began to press the five jurors who had steadfastly voted for the Plaintiff and a finding of negligence in answer to

3

Question No. 1.  At this time Alexander spoke mainly to Juror Number 10 'Tara', and a Juror named 'Janet' both of whom were in favor of the Plaintiff.  Alexander stated to them that the 'numerics favored the defense' and that 'you cannot argue with the numbers'.

"Eventually we were unable to reach a consensus and it was decided that the jury would return to the courtroom and declare that a verdict could not be reached.  While in the courtroom, Juror Number 11, Elizabeth, asked a question of the Judge.  Elizabeth asked whether or not juror should make decisions in the case based upon what the juror felt was right in their heart or whether or not the juror should use logic and reason to decide the issue.  As I recall the Judge answered the question by referring Elizabeth to the jury instructions.  Elizabeth had consistently voted for the defense and stated during deliberations that she was 'in agreement' with Alexander's mathematical probability formulas and conclusions.  After the jury returned to the jury deliberation room, Alexander again forcefully explained his numerical calculations again and Tara and Janet both changed their vote in favor of the defendant resulting in a verdict of 9-3 in favor of the defendant Michel Phelps."

The trial court denied the motion for a new trial.  The court concluded juror Alexander did not commit misconduct.  He did not introduce evidence extrinsic to the case, so much as devise a way to weigh and assess the evidence.

DISCUSSION

I.

Hull contends the trial court erred in denying his motion for a new trial based on juror misconduct.

Juror misconduct is one of the grounds specified for granting a new trial. (Code Civ. Proc., § 657, subd. (2).)  In ruling on a motion for a new trial based on juror misconduct the trial court must determine whether the affidavit supporting the motion is admissible; if admissible, whether the facts establish misconduct; and if there is misconduct, whether it was prejudicial.  (*Whitlock v. Foster Wheeler, LLC* (2008) 160 Cal.App.4th 149, 160.)  We review the trial court's determination for an abuse of discretion.  (*Ibid.*)

4

The trial court stated the correct standard for determining the admissibility of the evidence: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

The court did not expressly rule on the admissibility of any of the evidence contained in the juror's affidavit. Instead, the court ruled that the evidence contained in the affidavit did not show misconduct.

Hull argues that Alexander's use of a mathematical formula and a graph to determine the truth constitutes an improper experiment.

Hull relies on *People v. Collins* (2010) 49 Cal.4th 175. In deliberating the penalty in a death penalty case, the jury was considering whether Collins "executed" the victim. One juror went home and entered the heights of the defendant and victim and the angle at which the bullet entered the victim's head into a computer program. The program confirmed the juror's belief that the defendant was standing above the victim when the victim was shot. The next day, in the jury room, the juror used two jurors, a protractor and some string to demonstrate various possibilities concerning the relative positions of the defendant and victim. The trial court granted a new penalty phase trial on the basis of juror misconduct. The Court of Appeal reversed. Our Supreme Court affirmed the Court of Appeal.

In concluding there was no jury misconduct, our Supreme Court stated: "Not every jury experiment constitutes a misconduct. Improper experiments are those that allow the jury to discover *new* evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing all reasonable inferences.

5

It may reexamine the evidence in a slightly different context as long as that evaluation is within the "'scope and purview of the evidence.'" [Citation.]" What the jury cannot do is conduct a new investigation going beyond the evidence admitted." (*People v. Collins*, *supra*, 49 Cal.4th at p. 249.) The court determined that both the juror's use of a computer program and the demonstration in the jury room were simply means of analyzing the evidence presented at trial. (*Id.* at pp. 252, 255.) The court cautioned, however: "If, for example, a juror conducts an investigation in which he or she relies on software that manipulates the data, subjecting it to presumptions written into the program, such use would likely constitute an improper experiment." (*Id.* at p. 256.)

Hull argues that this case is an example of the type of case to which the Supreme Court gave its caution against the use of software that manipulates the data, subjecting it to presumptions written into the program. But the juror's affidavit states only that a juror used some unspecified mathematical formula and graph to analyze the evidence. It does not show that the formula and graph contained presumptions that manipulated data. The affidavit shows only that a juror used mathematics as a means of analyzing the evidence presented at trial. That is not misconduct.

Hull's reliance on *People v. Castro* (1986) 184 Cal.App.3d 849, 854, is also misplaced. There a jail guard testified he saw the Castro throw a burning mop into a maintenance building. The guard was using binoculars from 50 to 100 yards away from the building. A juror went home and used his own binoculars to test the witness's' credibility. The Court of Appeal concluded the juror committed misconduct.

But the juror in *Castro* added evidence outside the field of evidence admitted at trial by using a different set of binoculars than the jail guard used. Here there was no showing the mathematical formula and graph were anything other than a way of thinking about the evidence admitted at trial.

The trial court was correct. The juror affidavit does not show misconduct.

## II.

Hull contends the trial court erred in refusing to instruct the jury that a landlord has a nondelegable duty to remove a dangerous condition from his property.

6

Hull relies on the rule that under the doctrine of nondelegable duty, "a landlord cannot escape liability for failure to maintain property in a safe condition by delegating the duty to an independent contractor. . . ."  (Citing *Srithong v. Total Investment Co.* (1994) 23 Cal.App.4th 721, 726.)

Hull's theory appears to be that Phelps's tenants, Lennon and Jones, were independent contractors.  Hull cites *White v. Uniroyal, Inc.* (1984) 155 Cal.App.3d 1, 24, for the proposition that an independent contractor is "a person who is employed by another to perform work; who pursues an "independent employment or occupation" in performing it; and who follows the employer's "desires only as to the results of the work, and not as to the means whereby it is to be accomplished."  [Citations.]"

But Lennon and Jones were not employed by Phelps.  The only relationship between Phelps and Lennon and Jones was landlord and tenant.  Phelps required Lennon and Jones to remove the dog, not because he employed them as independent contractors, but because keeping the dog on the premises violated their lease.  This case presents no basis for a nondelegable duty instruction.

The judgment is affirmed.  Costs are awarded to respondent.

NOT TO BE PUBLISHED.


GILBERT, P. J.


We concur:


YEGAN, J.


PERREN, J.

7

Rebecca S. Riley, Judge

Superior Court County of Ventura
_____


Lowthorp Richards, Jeffrey D. Johnsen for Plaintiff and Appellant.

Priscilla F. Slocum, Stub Boeddinghaus & Velasco, Jacob Aall Stub for Defendant and Respondent.