**Wytheville.**

90 109
94 157

90 109
100 792

TAYLOR v. COMMONWEALTH.

JULY 6th, 1893.

1. HOMICIDE—*Grand Jury—Foreman*—Objection that grand jury was not constituted, and foreman not selected and sworn, as required by law, cannot be raised for first time in the appellate court, but must be by plea in abatement.

2. VENIRE FACIAS—*Record.*—It appearing that the *venire* was issued by order of the trial court, *held*, no error that it is not made part of the record.

3. EVIDENCE—*Previous Assault.*—On trial for murder, testimony that about three weeks before the homicide the bed of the deceased was fired into, *held*, admissible, where prisoner several times mentioned the firing in a manner indicating he had done it himself, or procured it to be done.

4. IDEM—*Uncommunicated Threats.*—Though after the homicide prisoner absconded, the exclusion of uncommunicated threats against him, *held*, not error.

5. IDEM—*Rumor—Flight.*—General talk in the community that if certain persons found prisoner they would kill him without attempting to arrest him, *held*, inadmissible on trial for murder to rebut the fact of his immediate flight and concealment and endeavor to leave the State.

6. IDEM—*Indictment against Another.*—It is not error to exclude as evidence an indictment against another person for the same offence.

7. VERDICT—*Affidavits of Jurors.*—The affidavits or declarations of jurors showing that they acted on evidence other than that adduced before them at the trial, cannot be used to impeach the verdict.

8. MISCONDUCT OF JURY.—Upon trial for murder, cartridge hulls found at the scene of the homicide have been introduced by the prosecution, and prisoner's Winchester rifle, with shells fired from it during the trial, has been introduced by him to show that the plunger struck the shells differently from those introduced by the prosecution ; and the jury were permitted, without objection, to take the rifle and shells to their room ; *held*, it was not misconduct in the jury to take it apart and examine the plunger and ascertain that they have been recently tampered with and

fixed so as to explode the cartridge differently from those put in evidence by the prosecution.

9. INSTRUCTIONS—*Reasonable Doubt.*—It is not error to strike out the words, "to doubt is to acquit," from an instruction where the law of reasonable doubt was given in its most favorable form for the prisoner. *Tucker's Case,* 88 Va., 20.

10. IDEM—*Inferences.*—It is not error to refuse to instruct the jury that no inference can be drawn from prisoner's failure to introduce any evidence to show where he was on the day of the homicide, where it is in evidence that he told a witness that he was at that time in another State, as instructions not applicable to the evidence, are inadmissible.

11. QUESTION UNANSWERED.—Assignment of error in refusing to allow a witness to answer a certain question is unavailable in the appellate court where the record does not show what the answer would have been.

12. CASE AT BAR.—The evidence in the record warrants the verdict of guilty of murder in the first degree.

Error to judgment of circuit court of Wise county, rendered September 10, 1892, upon a verdict of a jury convicting the plaintiff in error, M. B. Taylor, of murder in the first degree of one Ira Mullins, and sentencing him to be hanged by the neck until dead on December 16, 1892. Opinion states the case.

*Duncan, Miller & Alderson,* for plaintiff in error.

*Attorney-General R. Taylor Scott* and *E. W. Fulton,* for commonwealth.

FAUNTLEROY, J., delivered the opinion of the court.

The record of the proceedings of the trial court in this case, to be reviewed by this court, presents no question of the *corpus delicti.*

About 9 or 10 o'clock in the morning of the 14th day of May, 1892 (Saturday), *Ira Mullins,* a helpless paralytic who had to travel in a wagon, started in a wagon drawn by two horses, and accompanied by his wife and fifteen-year-old son,

John H. Mullins, and John Chappel, Greenbury Harris, Wilson Mullins, and Jane Mullins, from the house of Wilson Mullins on Elk Horn, in Kentucky, near the Virginia line, to go to the home of the said Ira Mullins, in Wise county, Virginia. When they had crossed the State line, and had got about half a mile from Pond or Pound Gap, on this side of top of the mountain about one-fourth or one-half of a mile, they were fired on, in the public highway, in the county of Wise, from a blinded and barricaded ambush, some twenty or tweny-five steps from the road; and the said Ira Mullins and his wife and John Chappel, Greenbury Harris, and Wilson Mullins were all five instantly killed, and the horses to the wagon were also killed. The boy, John H. Mullins, started to run as soon as the firing began, and as he ran, a bullet grazed his body and cut his suspenders behind and nearly cut them in two. Jane Mullins, the wife of Wilson Mullins, says she was along when Ira Mullins and the other persons were killed; and that she saw three men standing some twenty or twenty-five steps from the wagon, and halloed: "Boys, for the Lord's sake don't shoot any more; you have killed them all now." They replied: "God damn you, take the road and leave, or we will kill you." Ira Mullins received eight shots, and was instantly killed as he lay in his wagon. Thus, as the record shows, were five persons, travelling upon the highway in Wise county, Virginia, at mid-day on Saturday, the 14th day of May, 1892, waylaid and cruelly murdered and hurried into eternity without a moment's warning or apprehension, by dastardly assassins crouching on the roadside in a prepared ambush for the bloody and brutal deed.

Who perpetrated this dark crime—this inhuman and wholesale massacre of innocent and unsuspecting men, women, and children, travelling peacefully upon the public highway in Wise county, Virginia, at mid-day on the 14th day of May, 1892?

Suspicion pointed to M. B. Taylor, the plaintiff in error,

who had fled from his home, and after concealing himself for a time, was endeavoring to make his way to Florida, when he was arrested. At the August term, 1892, of the county court of Wise county, a special grand jury impannelled for the term of the court, and sworn as a special grand jury of inquest in and for the county of Wise, after receiving their charge retired to their room to consider of their presentment and indictment, and returned into court, having found the following indictment, to wit: An indictment of the commonwealth against M. B. Taylor for the murder of Ira Mullins, endorsed "a true bill," and signed by J. M. Wampler, foreman. Which said indictment was entered of record in the said court, and the accused was placed at bar for trial. Taylor, the accused, offered a plea in abatement, which was refused by the court; he demurred to the indictment, and the demurrer was overruled; he then elected to be tried in the circuit court of Wise county, and he was remanded for trial to that court. He was tried in that court at the September term, 1892, by a jury of his peers from the vicinage, and found guilty of murder in the first degree, as charged in the said indictment, and sentenced by the court to be hung on the 16th day of December, 1892. He moved an arrest of judgment, and to set aside the verdict because contrary to the evidence, and, in the course of the trial took *twelve* bills of exceptions to the rulings of the court. These motions were denied, and a writ of error and *supersedeas* was applied for and obtained from one of the judges of this court.

We have now to review the proceedings of the trial courts below, and to determine whether the plaintiff in error has been lawfully tried and convicted of the awful and atrocious crime of which he has been found guilty by the jury and sentenced to death by the court; whether the evidence in the record warrants the verdict of the jury, and whether the accused, from the beginning to the end of his trial, has been allowed all the safeguards which the law of Virginia throws around

her citizens when indicted, arraigned and tried at the bar of her criminal justice.

The petition of the plaintiff in error represents that he is aggrieved in the following particulars, viz: " 1. Because the said supposed grand jury which returned the said supposed indictment against petitioner was not constituted as required by law, and J. M. Wampler, who signs and returns said supposed indictment " *a true bill*," was not selected and sworn as foreman of said grand jury as required by law." This assignment of error is not well taken. The objection is made for the first time here; the defect, if any, should have been taken advantage of by plea in abatement, but it sufficiently appears by the record that John M. Wampler was the foreman, for the court received from the grand jury the indictment signed by him as such, and it moreover appears by the record that they were all duly sworn. The *second* and *third* and *ninth* assignments of error were abandoned in court and withdrawn. The fourth assignment of error is that no venire was issued directing the sheriff to summon the jury from a list furnished by the court for the trial of petitioner, &c. This is without merit. The venire can only become part of the record by bill of exceptions, and the record shows that the venire was issued by order of the court, and this is all sufficient.

*Fifth.* " The court erred in permitting the witness, Germima Harris, to testify that about three weeks before the killing of Ira Mullins his bed was fired into," &c. The fact that Ira Mullins' house and bed in which he was lying was fired into about three weeks before the killing, was important, material, and proper evidence in view of the testimony of sundry witnesses that the prisoner, over and over again, mentioned it in a way showing that he had done it himself or had procured it to be done. He said to witness, Noah Hubbard, "Ira Mullins offered $100 to have me killed on *Saturday*, and his bed was shot into on *Sunday*, but I was over in Kentucky." He said to witness, Dock Swindall, "Sometime after he had of-

fered the reward to have me killed, *somebody* shot into his bed, but it wasn't me, and laughed." His declarations to three other witnesses, about the shooting into the bed of Ira Mullins to the same effect, made the evidence of the fact of the shooting into the bed of Ira Mullins admissible.

*Sixth.* "The court erred in not allowing the witness, John H. Roberson, to answer the question propounded to him, as shown in bill of exception No. 2." The court very properly refused to permit the witness, John H. Roberson, to give in evidence *uncommunicated* threats by McFall and others against Taylor made after the killing of Ira Mullins and but shortly before Taylor's trial. But it does not appear what the answer to the question would have been, and it cannot be said that he was injured by the ruling to reject it, which must affirmatively appear.

*Seventh.* "The court erred in refusing to allow the witness, John H. Roberson, to answer the question propounded to him, as shown in bill of exception No. 3," &c. The witness answered this question, "It was the general talk in that community that if McFall and others found Taylor that they would kill him without attempting to arrest him." This general talk about the awful tragedy which had been enacted, could not rebut the fact of the prisoner, Taylor's immediate flight, concealment, and attempt to get to Florida; and the court did not err in refusing to let it go to the jury to rebut the fact in the case : that the "wicked fleeth when no man pursueth."

*Eighth.* "The court erred in allowing the witnesses, Clifton Roberson and Floyd Branham, to testify, and the jury to consider their statements, because said testimony tended to contradict the testimony of Mrs. Mary Roberson, a witness introduced by the commonwealth on said point." It passes all understanding, how testimony discordant among the witnesses for the prosecution could injure the prisoner; and the testimony of these witnesses was admissible on the credibility of the *alibi* set up by the prisoner.

The ninth assignment was abandoned and withdrawn.

The tenth assignment is set forth in the sixth bill of exceptions: "The jury was then withdrawn from the court-room, and the witness, Henry Hall, stated: 'The words, as I remember them, was Dr. Taylor told me that this woman, the wife of Henry or Talt Hall, was living at Ira Mullins', and I told him if that was the case, by watching the house of Mullins he could tell whether either of the Halls came in there or not.' In this connection, counsel for the defence, in response to question whether they proposed to prove that said woman was, in fact, at Mullins' house, avowed that they could and would only prove, if permitted, that there was about that time a loose woman staying with Ira Mullins, whose name they could not show; but the court refused to permit said statement to go to the jury." What relevancy the excluded statement could have had is not discoverable; and it was properly rejected.

The eleventh assignment is: The court erred in refusing to permit the indictment preferred by the grand jury and then pending in the county court of Wise county, against Henry Adams for the murder of Ira Mullins, to go the jury and be considered by them. The record of an indictment against Henry Adams was unconnected with and foreign to the issue between the accused, B. M. Taylor, and the commonwealth; was *res inter alios acta*, and improper evidence, which was not admissible to go to the jury.

The twelfth assignment of error is based upon the eighth bill of exceptions: "That upon the trial of this cause the commonwealth introduced in evidence two cartridge hulls, 45–75; and the defendant introduced in evidence a Winchester rifle which shot a 45–75 cartridge, and proved that said rifle was the gun of the defendant Taylor. And the defendant also introduced in evidence four 45–75 cartridge hulls, and proved by John S. Wright that the four cartridges were shot by him out of the Taylor gun during the present trial. At the time the gun was introduced it was apparently in shooting

condition, and was not taken to pieces, in whole or in part, in the court-room. Shortly after the jury retired to their room to consider of their verdict they sent down to the court to know if they could have the gun; whereupon the court asked counsel on both sides if there was any objection to the jury having the gun in their room during their deliberation, and there was no objection from either side. The gun was then sent to the jury; and after the jury returned their verdict the defendant moved the court to set aside said verdict and arrest judgment thereon, because, as claimed, that in their room, in the absence of the prisoner, the jury took said gun to pieces and examined the plunger; and in support of said motion tendered the affidavit of William Wolfe, P. Debusk, and Elisha Tate, which is in the words and figures following, viz:

" We, the undersigned, hereby state that we were members of the jury that returned a verdict of guilty of murder in the first degree against M. B. Taylor, and that after we took the Winchester rifle to our jury room we took the same to pieces and examined it to see whether or not it had been recently tampered with, and especially to see if what is called the plunger, being the piece which strikes the cartridge and causes the explosion, had been changed in any way since the shooting; and upon such examination we reached the conclusion that the gun had been tampered with recently."

Then follows the affidavit of J. M. Mills, another juror, in the same words and to the same effect, adding: " Which examination caused me and E. P. Graham, to my own knowledge, to find a verdict of guilty, while, if we had not made such an investigation, we would not have found such a verdict, &c."

Then follow the affidavit of Wilson Holbrook, the sheriff of Wise county, and the affidavit of one John A. Miller, that the jury did examine the gun, and that the plunger is now in the gun differently from the way they usually are in Winchesters, &c.

There is no legal evidence in the record that the gun was either taken to pieces, or that the jury acted on what they saw. The general rule is that the affidavit of a juror, and much less his *declaration*, attacking or impeaching the verdict which he has rendered, is not admissible and cannot be considered by the court. *Howard* v. *McCall*, 21 Gratt., 205; *Commonwealth* v. *Bull*, 14 Gratt., 628; *Read's Case*, 22 Gratt., 947, and this is the English rule. But in this case the affidavits of the jurors, even if admissible, prove no misconduct on the part of the jury, nor any ground for the motion to the court to set aside the verdict. The gun was introduced in evidence by the prisoner, and the four cartridge hulls fired from that gun, during the trial, by one of the prisoner's witnesses, were put in evidence by the prisoner to show the jury that they were struck by the plunger *in his gun* differently from the two cartridge hulls which the prosecution had put in evidence as they had been picked up on the scene of the massacre. The gun was given to the jury in their room, without objection and by consent, and there is no exception on the ground that the gun was taken into the jury room. The court did not tell the jury how they should look at, examine, or consider the gun. The jury had the right to take the gun apart, and to examine the *plunger* to see (as they did see plainly) that the gun and the plunger had been recently *tampered with*, and fixed so as to strike and explode the cartridges differently from those which had been used by the murderers, and put in evidence by the commonwealth. *Davis* v. *State*, vol. 17 S. E. Reporter, p. 292.

The prisoner's gun and the four cartridge hulls fired from it, during the trial, by one of the prisoner's witnesses to show that the plunger in *that gun* struck the cartridges differently from the cartridge which had done the fiendish work of the cowardly assassins in their ambush, *were put in evidence by the prisoner;* but the dumb witness of the gun itself mutely convinced an intelligent and scrutinizing jury that the plunger in

that gun had been recently tampered with and fixed for the occasion of the trial.

The thirteenth error assigned is the refusal of the court to instruct the jury that they could draw no inference from the prisoner's failure to introduce any evidence to account for his whereabouts on the awful day of the murder of five peaceable and defenceless persons in the public highway, although it was in evidence that he had told the witness, Branham, that he was at that time "waiting on some sick folks on the other side in Kentucky," or from his utter failure to explain the many other suspicious circumstances that surrounded him. This instruction, as asked for, is vicious, and it was properly refused by the court, who had already in two preceding instructions told the jury that, "in the eyes of the law every man is presumed to be innocent until he is proven guilty, and not only is the burden of proving the guilt of a person charged with crime, on the commonwealth, but to warrant a conviction the guilt of the accused must be proved to the exclusion of every reasonable doubt."

The fourteenth assignment of error is the modification of an instruction asked for by the prisoner by the elimination therefrom of the phrase, "the court tells you that to doubt is to acquit," and the giving by the court to the jury, "The court further tells the jury that circumstances of mere suspicion are not sufficient to warrant a verdict of guilty, but before you can convict the prisoner you must be satisfied from the evidence not only that the circumstances are consistent with the prisoner's guilt, but they must be satisfied from the evidence that the facts are such as to be inconsistent with any other rational conclusion than that he is guilty." The law of *reasonable* doubt was, by this instruction, given in its most favorable form for the prisoner. In *Tucker's Case* (reported in 88 Va.), Lewis, P., says, in quotation marks, it has been said, "to doubt is to acquit," but this follows a clear and emphatic

insistence, that *the doubt* must be a reasonable doubt of the sufficiency or certainty of the evidence of guilt; and in the case of *Williams* v. *Commonwealth*, 85 Va., 609, Judge Lacy delivering the unanimous opinion of the court, said, in substance, that *the doubt* must not be an arbitrary or unreasonable doubt, or a doubt of immaterial and non-essential circumstances, but must be a reasonable doubt of some fact or facts in the evidence, essential for the jury to believe to warrant a verdict of conviction.

The fifteenth assignment of error is set forth in the eleventh bill of exceptions, which certifies: "When, as a matter of fact, no reference had been made during the progress of the case to the prisoner's failure to testify in his own behalf, but the prisoner, by his counsel, urged the court to give the instruction—"the court instructs the jury that the failure of the defendant to testify in his own behalf creates no presumption against him"—the court then, at the urgent request of the prisoner, by his counsel, gave the said instruction to the jury, stating to the jury that it was given at the request of the counsel for the prisoner.

At the same time that the foregoing instruction was offered the following instruction was asked for by the prisoner, by his counsel: "The court further tells the jury that they should not draw any inference against the prisoner because he failed to produce witnesses from the State of Kentucky to show where he was on the day of the killing." This last instruction the court refused to give. This assignment of error is not well taken. The instruction, number one, was given on the prisoners own motion and urgent insistence; albeit, that no reference had been, nor properly could be, made to the prisoner's failure to testify in his own behalf; and the instruction number *two*, asked the court to invade the province of the jury, and to tell them that they could not draw any inference whatever from the failure of the prisoner to even attempt to do what he told the witness Branham—that he "could prove

directly where he was that day—waiting on some sick folks on the other side in Kentucky." He did not disclose the names of any pretended witnesses, nor prove, nor state his inability to procure any witness or testimony from Kentucky. Instructions must apply the law to the evidence before the jury; and they must be conformed and confined to the evidence. These instructions did neither.

The sixteenth assignment is that "the court erred in refusing to set aside the verdict of the jury because the same is contrary to the evidence." A careful scrutiny and anxious consideration of the evidence in the record leaves no doubt in the mind of the court of the guilt of this prisoner and the correctness of the verdict of the jury, and a critical review of all the proceedings of the trial court, at every stage and in every particular, constrains us to affirm the judgment pronounced upon that verdict, and to vindicate the majesty of the violated law. The trial of the prisoner was presided over and conducted by a careful and conscientious judge, whose rulings on all points were correct, and a jury of twelve honest and intelligent men from the vicinage, qualified and free from exception, after seeing face to face and hearing the witnesses, *one and all*, have found the prisoner, M. B. Taylor, guilty of murder in the first degree. In this court the case must be considered as on a demurrer to evidence; and a simple statement of the evidence will show the prisoner's guilt conclusively and beyond a rational doubt. Of the *seven* in the party of unarmed and helpless men, women and children that received the murderous volley from the ambush only fifteen or twenty-five steps from the roadside, at midday of the 14th of May, 1892, only *two* escaped sudden and instantaneous death. John H. Mullins, the fifteen-year-old son of Ira Mullins and his wife (both of whom were killed), ran from the scene at the first fire, and did not see any of the persons who did the shooting, though a shot passed through his clothing and cut his suspenders behind. He proves (as several other witnesses do) that Ira Mullins had

with him in the wagon over $1,000 in money, which was partly in a belt worn by his wife under her dress, and the residue in a little hand bag in the wagon. The pocket was cut from the belt and gone, and so was the hand bag gone. Mrs. Jane Mullins, the widow of Wilson Mullins, who was killed, says that she was along when Ira Mullins and the other persons were killed; had got about half a mile from Pond Gap when the shooting commenced from the right side of the road, and above the road; my husband started to run; he got about ten or fifteen steps when I saw him fall, and I saw one of the horses fall. I ran to my husband and found he was shot. I turned him on his side and looked towards where the shooting came from and then started back to the wagon to see if the others were killed. I saw three men standing some twenty or twenty-five steps from the wagon. I hallooed boys, for the Lord's sake don't shoot any more; you have killed them all now. They replied: " God damn you, take the road and leave or we will kill you." I took it to be Dr. Taylor, Henan and Calvin Fleming. I recognized them by seeing them. They had green veils over their faces. I recognized Cal. Fleming's voice, and I also thought I recognized Dr. Taylor's voice. The veils were over their heads and faces. I could see the lower part of their faces. I thought I recognized M. B. Taylor. On cross examination she said she could see the parties who did the shooting from their breasts up. They spoke three or four times; I took it to be Cal. Fleming who spoke first. I have known Dr. Taylor for fifteen years. I am not point-blank certain that it was Dr. Taylor, but I think it was. I recognized Dr. Taylor mostly by his looks, and saw him from the breast up. She could see him from waist up to the place where the veil came. She also said that there was, at the time they were talking to her, a slight cessation of the firing, when the smoke rose so that she could see them.

Dock Swindall testified: I live 150 yards from Ira Mullins'

house.    Dr. M. B. Taylor stayed all night at my house on Saturday night before Ira Mullins was killed.    He asked me about Ira, and said Ira had offered $300 for his life.    I was in bed when he came to my house.    He asked me to get up and come out on the porch, that he wanted to talk to me.    He said that sometime after he (Ira Mullins) had offered the reward to have him killed, somebody had shot into his (Ira Mullins') bed, but it wasn't me, and laughed.    He said there was aiming to come up big trouble, and that the Fleming boys would not bother me and Colonel Swindall any more; that he had that fixed. He asked me if there was anyone I wanted put out of the way, and I said I don't want anybody put out of the way, unless it was somebody that wouldn't live under the law.    And he said what about Martin Sowards and Ira Mullins?    Martin Sowards and me had had some trouble.    I told him that I thought Ira Mullins was a very good neighbor.    I didn't know much about him.    He then told me to keep Martin Sowards and Ira Mullins located until the trouble came up; that he would be at my house every other night until the trouble came up.

Another witness, Grigg Swindall, confirms all the testimony of the foregoing witness, Dock Swindall.

Reuben McFall testifies that Dr. M. B. Taylor proposed to him at various times, to go with him and kill the Mullins boys—Ira and Henderson.    The last time he mentioned it to me, he said he had gone once by himself and put a man out of the way, and if we boys would not go with him, he would be damned if he could not go by himself and do it again.

Granville Cox testified: Taylor tried several times to get me to go to Kentucky with him to kill Ira Mullins and Henderson Mullins; said he wanted us to go and help clean up the head of Elkhorn.    He said, If I don't get it done this year I will do it next year, or have it done.

John Branham testified that he saw Taylor (the prisoner) Thursday after the killing and he had a Winchester gun.    He

had been in the habit of carrying a Winchester gun for five or six years. He said he had heard all about the killing; that he was going on to court and have Doc Mullins swear that Ira Mullins had offered Doc Mullins $250 to have him (Taylor) killed; that Doc Mullins had told him all about it. I did not think he seemed exactly natural—he seemed to talk a little lower than common.

W. M. Gilliam testified, that about one week before the killing he met M. B. Taylor (the prisoner), who told him that Ira Mullins had tried to hire Doc Mullins to kill him; and said he was over in Kentucky, and some one shot in Mullins' bed. He said, The spirits told me of it, and he laughed, and said, you have not got sense enough. This statement is confirmed by Milburn Gilliam and Joe Perkins, who heard the conversation detailed by the witness, W. M. Gilliam.

Miss Mary Branham and Logan Nottingham testified that they saw M. B. Taylor (the prisoner) and Cal. Fleming on Sunday night before the killing, going in the direction of Pond Gap, riding fast and sitting up straight in their saddles.

George E. Roberson and John Venters testified to seeing M. B. Taylor with the Fleming boys, all armed with Winchester rifles, repeatedly just previous to the killing and subsequently thereto.

Time, place, motive, means, opportunity, and conduct, both before and after the killing, all concur in pointing to the prisoner and the Flemings—Calvin and Henan—as the three guilty assassins, who were recognized in the act by Mrs. Jane Mullins. When last seen before the killing, the prisoner was going, under the cover of night, with his *pal,* Calvin Fleming, in the direction of Pound Gap, where Ira Mullins had, unexpectedly to him, gone the day before from his home, where he had told Doc Swindall to keep him located until the trouble came up, and that he would be at his (Doc Swindall's) house every other night till the trouble came up. But the prisoner

never returned again to Doc Swindall's house, because his victim (whom he wanted "*located* till the trouble came up") had gone through Pound Gap into Kentucky. But he, no longer concerned about a loose woman staying at Ira Mullins', turns his attention to Pound Gap, through which he knew Ira Mullins must return to his home, and there, in a lonely spot on the mountain, he fixes an ambush in fifteen or twenty-five steps from the roadside, from which, a few days afterwards, he and the Flemings slaughter Ira Mullins and four other of his party, and kill the horses to his wagon, and rob the money, over $1,000, which was in the wagon and on his wife's person. At the time and place of the horrible crime he is in close proximity to the scene, and he does not show or attempt to show that he was elsewhere. He told numerous persons that Ira Mullins had tried to have him killed, and he habitually carried a Winchester rifle of 45–75 calibre, the same that were found at the place of the murder. His conduct was that of a guilty man. After the murder he took to the brush with the Fleming boys, and as they were, was always armed; he told Noah Hubbard that he was going "to keep in the brush and keep the law on his side." And after skulking in the woods and resisting arrest with the Fleming boys, armed to the teeth, all of them, for some time, he concealed himself one whole week up stairs in a lumber room at Norton, and his meals were handed up to him through the floor, until he takes passage on a freight car for Florida, and thence to the West, never to return to Virginia. All these and many other circumstances pointing powerfully to his guilt are wholly unexplained, and they are supplemented by the direct testimony of Mrs. Jane Mullins, an eye witness to the killing, who recognized the prisoner and the Flemings, at the distance of only a few steps, both by seeing them from their waists up, and by their voices as she parleyed and pleaded with them not to shoot any more. She had known the prisoner for fifteen years, and was well

acquainted with the Fleming boys. The verdict of the jury is not only supported by the evidence, but it is demanded by the *suprema lex*—the safety and civilization of society. The trial was, in all respects, proper, and we affirm the judgment of the circuit court of Wise county under review, and remand the case for further proceedings in said court according to law.

RICHARDSON, J., dissented.

JUDGMENT AFFIRMED.