Filed 8/30/13  P. v. Childers CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>CHRISTOPHER MARK CHILDERS,<br><br>        Defendant and Appellant. | D062971<br><br><br>(Super. Ct. Nos. SCD231261/<br>  SCD228796) |

APPEAL from a judgment of the Superior Court of San Diego County, John S. Einhorn, Judge.  Affirmed in part; reversed in part; remanded with directions.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry J. Carlton and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Christopher Mark Childers of carjacking (Pen. Code,[1] § 215, subd. (a); count 1) and possession of a firearm (§ 12021, subd. (a)(1); count 3). The jury also found it true that Childers personally used a firearm (§12022.53, subd. (b)) when he committed the carjacking. Count 3 and the firearm use enhancement were dismissed during the hearing on Childers's new trial motion.

Childers admitted that he had suffered a prior serious felony conviction (§ 667, subd. (a)(1)), a prior strike conviction (§§ 667, subds. (b)-(i), 668, & 1170.12), and a prison prior conviction (§ 667.5, subd. (b)). It also was alleged that Childers committed a felony (count 1) while on bail pending final judgment on an earlier felony offense.[2] (§12022.1, subd. (b)). Although Childers appeared prepared to waive both his rights to a jury trial and to present evidence in regard to the out-on-bail enhancement at the same time as he waived these rights to the other enhancements, the court did not ask Childers to admit to the out-on-bail enhancement. Nevertheless, the court sentenced Childers to prison for a total of 17 years, two of which were imposed for the out-on-bail enhancement.

Childers appeals, contending (1) his Sixth Amendment due process rights were violated because the court refused the jury's request to manipulate the subject gun during deliberations and (2) his sentence for the out-on-bail enhancement must be stricken. We

---

[1] Statutory references are to the Penal Code unless otherwise specified.

[2] This same allegation was made as to other counts charged against Childers. Because we are only concerned with count 1 in this appeal, we discuss the out-on-bail enhancement only in regard to count 1.

2

agree with Childers that the trial court improperly sentenced him under the out-on-bail enhancement and reverse the judgment as to that portion of the sentence only. However, we remand the matter to the court to conduct further proceedings regarding the out-on-bail enhancement. In all other aspects, we affirm the judgment.

FACTUAL BACKGROUND

Prosecution's Case

Roy Rodriguez was driving his Mercedes in the slow lane of westbound Interstate 8. As Rodriguez neared Interstate 15, the traffic in front of him abruptly slowed down. Rodriguez applied the brakes while he noticed a red Nissan sitting on the shoulder of the freeway. Next, Rodriguez saw Childers walking towards him in the slow lane of the freeway. At first, Rodriguez thought that Childers was carrying a wrench and experiencing car trouble. Rodriguez soon realized that Childers was holding a gun with a long barrel or a silencer.

Childers walked to Rodriguez's window, pointed the gun at him and said, "Get out." Fearing that he was going to be shot and killed, Rodriguez complied. Rodriguez testified that he was struck by Childers's eyes, which he described as "scary." Rodriguez explained, "they were sunken, they were drawn, they were dark, and they told me that I needed to get out of the car." As Childers got behind the wheel of the Mercedes, a woman climbed out of the red Nissan and into the passenger seat of Rodriguez's car. Rodriguez called 911 to report the incident after Rodriguez drove away.

Johanna Ginsberg was in the car behind Rodriguez's Mercedes. When she saw Rodriguez's car stop, Ginsberg slammed on her brakes and swerved onto the shoulder.

3

She saw Childers walk up to Rodriguez's car. She noticed the ridge of Childers's brow, the wrinkles on the bridge of his nose, and his eyes. Childers's eyes reminded her of the eyes belonging to a friend of her father's, whom she had known for 10 years. Ginsberg also noticed a woman standing next to the apparently disabled red Nissan. Ginsberg drove away and called 911.

Eden Cortez was riding along Interstate 8 in a car driven by Touffique Atayee. As they drew near and passed Rodriguez, they saw Childers walking on the freeway with something in his hand that looked like either a crowbar or a gun. Cortez continued to watch in the side mirror and saw Childers climbing into the Mercedes. At Cortez's prompting, Atayee stopped and contacted Rodriguez. As soon as they learned what had occurred, Atayee began to pursue the Mercedes and simultaneously called 911 to report the incident. Atayee followed the Mercedes to northbound Highway 163 and continued following it as it turned west onto Friars Road. Atayee and Cortez lost sight of the car at that point, somewhere in Mission Valley.

Sergeant Russell Moore discovered the Mercedes the next day, parked behind some apartments in Lakeside and began watching it. He saw a man named Jason Poulsom drive it out of the complex. Poulsom drove to an address on Wildcat Canyon Road, about four miles away. There, he picked up Childers and drove to Barona Casino. Moore contacted other members of the San Diego Fugitive Task Force. They assembled in a parking lot close to the casino.

Half an hour later, Childers and Poulsom walked from the casino to the car. Childers was wearing Rodriguez's fedora hat and carrying Rodriguez's notebook (both of

4

which Rodriguez left in his car). As Childers and Poulsom began to open the car doors, Moore and his team deployed a "flash bang device" at the two men and ordered them onto the ground. Poulsom complied immediately. Childers began to move away from the car, assumed a fighting stance, and then broke into a run. Deputies shot Childers twice with bean bags. He continued to run even though he was moving in the direction of a SWAT team deputy who had drawn his gun and trained it on him. Finally, four other pursuing deputies were able to tackle Childers from behind and he was taken into custody.

In addition to the hat and notebook, Childers possessed a black ski mask, black gloves, syringes, and methamphetamine. During a search of the Mercedes's trunk, California Highway Patrol Investigator Joseph Corey discovered a replica .45 caliber Colt Commander wrapped in a plastic grocery bag. Corey noticed that the gun's barrel, which could easily be moved in and out, was stuck backwards into the replica gun. By the time of trial, the barrel was detached from the firearm.

Childers did not own the red Nissan left at the scene of the carjacking, but he often drove it. It was normally parked near a mobile home on property belonging to Kenneth Ruis. Childers and his wife had lived in that mobile home for the month preceding the carjacking. Ruis's relationship with Childers soured, however, and Ruis had evicted the couple 24 hours before the carjacking.

Poulsom testified under a grant of use immunity. Poulsom, who is an automobile mechanic, recalled that he met Childers a month or two before they were arrested together. The day of their arrest, both men were at George Walls's residence. Childers

5

asked Poulsom to take a look at the Mercedes because it was having some mechanical trouble. Poulsom took the Mercedes on a test drive to his apartment complex. When Moore picked up his trail, Poulsom was in the process of returning the car to Childers, who was then with Walls. When Poulsom arrived, Childers asked him to drive him to Barona Casino so he could meet a friend. Before they entered the casino, Childers asked Poulsom to hold a white grocery bag, which Childers said he had meant to throw in the trunk. Poulsom had no idea that the bag held a gun. As they were leaving, Childers asked Poulsom to drive again because Childers was not feeling well. Poulsom did not know the car was stolen.

Defendant's Case

Childers' primary defense was that Poulsom was the actual carjacker. Called as a witness by the defense, Michael Massey, an investigator with the San Diego County District Attorney's Office, testified that when he showed Ginsberg a photographic lineup before trial, she was initially unable to select any individual's photograph. She then vacillated between a photograph of Childers and another man. Eventually, she chose the latter as the person who looked most familiar to her. Massey also testified that when he showed the same photographic lineup to Cortez, Cortez pointed to three photographs, and said, "He kind of looks like these guys." None of those photographs depicted Childers.[3]

---

[3] Cortez was unable to identify Childers in court. Rodriguez was unable to pick out Childers's photograph from the lineup he was shown. When Corey showed Atayee a photographic lineup, he vacillated between the men depicted in photographs 3 and 5. Atayee eventually said, "I don't know, but if I had to pick somebody, it would be five." Corey testified that Childers's photograph was number 3.

DISCUSSION

I

*CHILDERS'S DUE PROCESS CLAIM*

A.  Childers's Contentions

Childers maintains the trial court violated his due process rights when it denied the jury's request to "manipulate the gun and/or the metal piece" that was admitted into evidence.  Childers's argument hinges on his belief that "the gun found in the stolen car a day later was the strongest evidence used to link [him] to the carjacking."  Childers explains that the jury's request revealed its uncertainty that the gun was the one Childers used to commit the carjacking, and the trial court deprived the jury of the opportunity to resolve that crucial factual issue.  Childers concludes he was prejudiced because "if the gun was taken out of the equation - if the jury determined that this gun was not used in the carjacking - the evidence would then suggest that it is far more likely that *Poulsom* was the carjacker, and not [Childers]."

B.  Background

During deliberations, the jury sent a note to the court that said, "We are close," and added, "If possible, we would like to see the gun in the assembled state as in the trunk (court's ex. #22) and pointed downward, to see if the barrel falls out."  In chambers, the trial court apprised both counsel of the jury's request and then indicated it would provide the following response:  "Our bailiff will bring the gun into the jury room for your viewing.  He will remain during your viewing.  Upon completion of your viewing, the bailiff will exit the jury room with the gun."  Childers's counsel did not object.  The

7

actual written response the court provided the jury read, "Our Bailiff will again produce the gun exhibit for your viewing, but neither the Bailiff nor any juror may manipulate the gun and/or the metal piece."

The next day, the trial court explained its written response out of the presence of the jury:

> "We received a note from the jury that was note No. 3. And in that case one of the questions they asked was to see the gun in the assembled state as in the trunk, and they reference Court's Exhibit 22. And they wanted to see the gun pointed downward to see if the barrel falls out.
>
> "I refused that request for the simple reason that the only evidence we had was that at the time of the carjacking, the carjacker used a gun that appeared to have a silencer on it. And that at the time the SWAT team took down Mr. Childers and that other guy at Barona, a search of the Mercedes, the stolen, jacked vehicle, in the trunk there was a gun and a piece of metal. And there was no other evidence that would connect the two or that there had been any changes.
>
> "There just wasn't a chain of custody of the gun as described in the carjack and the - - the gun as found in the Mercedes. Who knows what, if anything, happened between the jack and the arrest of Mr. Childers. So I said no.
>
> "What I permitted was that I permitted the bailiff to show the jury again the exhibit, which was the gun, the piece of metal, and the box. And there was something else in the box. I think it's a clip."

Childers's counsel did not object to the trial court's explanation.

### C. Forfeiture

A party who does not to object to evidence at trial fails to preserve the point for appeal. (*People v. Champion* (1995) 9 Cal.4th 879, 918; see *People v. Eckstrom* (1986) 187 Cal.App.3d 323, 332 [failure to object to evidence on the same ground as urged on

8

appeal precludes appellate review of the issue].)  This bar "is but an application of the general rule that questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal."  (*People v. Rogers* (1978) 21 Cal.3d 542, 548 (*Rogers*).)

The objection requirement is necessary in criminal cases because a "contrary rule would deprive the People of the opportunity to cure the defect at trial and would 'permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal.'  [Citation.]"  (*Rogers, supra,* 21 Cal.3d at p. 548.)  "The reason for the requirement is manifest:  a specifically grounded objection to a defined body of evidence serves to prevent error.  It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice.  It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal."  (*People v. Morris* (1991) 53 Cal.3d 152, 187-188.)

Childers's counsel did not object when the court first proposed its response to the jury's question about seeing the assembled gun when he was apprised of the response in chambers.  Later, when the court explained its written response to the jury, making clear that neither the bailiff nor any juror was permitted to manipulate the gun during the viewing, Childers's counsel did not object.

Here, Childers maintains that there was no need to object.  He asserts the court's initial response, as discussed in chambers, did not indicate that the jury could not manipulate the gun.  However, that proposed response only referred to the jury viewing

9

the gun. Although there was no objection when the court informed the attorneys of its actual written response to the jury, which made clear that the jury was not permitted to manipulate the gun, Childers insists that any objection at that point would have been futile because the jury had already reached its verdict. (See *People v. Boyette* (2002) 29 Cal.4th 381, 432.) We disagree.

It is clear from the record that at trial Childers's counsel made a strategic decision not to ask the court to allow the jury to manipulate the gun. When the court brought the jury's question to the attention of the parties in chambers, there is no indication in the record that Childers's counsel wanted the jury to manipulate the gun. While we agree that the court's first proposed response was somewhat ambiguous in regard to whether the jury would be permitted to manipulate the gun, Childers's counsel did not ask for clarification even though the court's proposed response only referred to the jury viewing the gun. Yet, there was no mention of the jury being permitted to manipulate the gun whatsoever. In other words, if the jury's opportunity to manipulate the gun was important to Childers's counsel, he should have addressed the issue with the trial court. He did not do so. Childers's counsel's inaction on this point was consistent with his closing argument where he downplayed the importance of the gun and argued to the jury that the gun was "not that powerful of evidence."

We are further persuaded that Childers's counsel did not want the jury to manipulate the gun when he failed to object to the trial court's subsequent explanation of its written response, making it clear that the jury was not allowed to manipulate the gun. Although the jury had reached a verdict, the verdict was unknown at that time. If the trial

court's actual response to the jury was different than what Childers's counsel had expected, Childers's could have objected or at least expressed his belief that the court's response was different than what he thought the parties agreed to in chambers. He did not. In fact, there is no indication in the record that Childers's counsel was troubled or surprised by the court's additional language in response to the jury's question.

In short, Childers's counsel's failure to object at trial forfeited this issue on appeal. (*People v. Champion*, *supra*, 9 Cal.4th at p. 918.)

### D.  The Merits

Even if we did not conclude that Childers forfeited his claim on appeal by failing to object at trial, we determine none of Childers's contentions regarding the jury's request to manipulate the gun have merit.

It is absolutely forbidden for jurors to do their own investigation outside the courtroom. (*People v. Conkling* (1896) 111 Cal. 616, 628 (*Conkling*).) However, " '[n]ot every experiment constitutes jury misconduct. "[J]urors must be given enough latitude in their deliberations to permit them to use common experiences and illustrations in reaching their verdicts." ' " (*People v. Bogle* (1995) 41 Cal.App.4th 770, 778 (*Bogle*).) Thus, jurors may, as a body, "engage in experiments which amount to no more than a careful evaluation of the evidence which was presented at trial." (*Bell v. State of California* (1998) 63 Cal.App.4th 919, 932.) They may also "bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience." (*People v. Marshall* (1990) 50 Cal.3d 907, 950.)

11

In analyzing the issue of juror misconduct, our high court set forth an exhaustive review of case law involving appropriate jury investigation, building upon "the venerable authority of *Higgins* [*v. L.A. Gas & Electric Co.* (1911) 159 Cal. 651 (*Higgins*)] and its progeny." (*People v. Collins* (2010) 49 Cal.4th 175, 249 (*Collins*).) In *Higgins*, *supra*, 159 Cal. at pages 656 through 657, the court had rejected claims of jury misconduct that were based upon the jury's examination of and possible experimentation with an admitted exhibit, a flashlight, in the jury room. In that context, the court long ago set out these governing rules:

> "It is a fundamental rule that all evidence shall be taken in open court and that each party to a controversy shall have knowledge of, and thus be enabled to meet and answer, any evidence brought against him. It is this fundamental rule which is to govern the use of such exhibits by the jury. They may use the exhibit according to its nature to aid them in weighing the evidence which has been given and in reaching a conclusion upon a controverted matter. They may carry out experiments within the lines of offered evidence, but if their experiments shall invade new fields and they shall be influenced in their verdict by discoveries from such experiments which will not fall fairly within the scope and purview of the evidence, then, manifestly, the jury has been itself taking evidence without the knowledge of either party, evidence which it is not possible for the party injured to meet, answer, or explain." (*Higgins*, *supra*, at pp. 656-657.)

From *Higgins, supra,* 159 Cal. 651 and subsequent authorities, the court in *Collins* distilled these principles: "Not every jury experiment constitutes misconduct. Improper experiments are those that allow the jury to discover new evidence by delving into areas not examined during trial. The distinction between proper and improper jury conduct turns on this difference. The jury may weigh and evaluate the evidence it has received. It is entitled to scrutinize that evidence, subjecting it to careful consideration by testing

12

all reasonable inferences.  It may reexamine the evidence in a slightly different context as long as that evaluation is within the ' "scope and purview of the evidence." '  [Citation.]  What the jury cannot do is conduct a new investigation going beyond the evidence admitted."  (*Collins*, *supra*, 49 Cal.4th at p. 249; italics omitted.)  Rather, it can use the entire scope of the record provided, in attempting to evaluate the trial evidence, in light of the issues raised by the circumstances of the charged offenses.  (*Id.* at p. 244.)[4]

As examples of impermissible jury experimentation that resulted in the acquisition of new evidence, the court in *Collins* cited to cases such as *People v. Castro* (1986) 184 Cal.App.3d 849, 852, in which a juror " 'went home and used binoculars to see if a witness could have possibly seen what he . . . said he did,' " and then took the information back to jury deliberations the next day.  This exceeded the record properly before the jury.  (See also *Collins*, *supra*, 49 Cal. 4th at p. 247, discussing *Conkling*, *supra*, 111 Cal. at pp. 627-628 [jury cannot conduct experiments to investigate the case outside the courtroom].)

Although not cited by *Collins, supra,* 49 Cal.4th 175, *People v. Turner* (1971) 22 Cal.App.3d 174, presents another example of proper jury investigation.  In *Turner*, the jury used magnifying glasses during deliberations to assist them in comparing two photographs.  (*Id.* at p. 179.)  That conduct did not constitute either new evidence or an

---

4       In *Collins*, the court relied on the views in *Bogle*, *supra*, 41 Cal.App.4th 770 to explain when a new field of inquiry has improperly been invaded by a jury.  In *Bogle*, the court said, " '[T]he term "field," as used in *Higgins*, does not mean one specific fact.  A "field," instead, is an area of inquiry, such as the extent of the defendant's access to the contents of the [murder victims'] safe or whether the defendant was a credible witness.' " (*Collins*, *supra*, 49 Cal.4th at p. 247.)

impermissible experiment. (*Id*. at pp. 182-183 [" ' "[T]he mere making of a more critical examination of an exhibit than was made during the trial is not objectionable." ' "].) "At most, the use of the magnifying glass involved an extension of the jury's sense of sight [citations]." (*Id.*, at p. 183.)

In *People v. Cumpian* (1991) 1 Cal.App.4th 307, 316, the court appropriately stated that jurors must be given some latitude in their deliberations to permit them to use their "common experiences" and illustrations in rendering a verdict. The court in *Collins* relied on the statement in *Cumpian*: " 'To prohibit jurors from analyzing exhibits in light of proffered testimony would obviate any reason for sending physical evidence into the jury room in the first instance.' [Citation.] An evaluation of a misconduct claim 'must necessarily focus on whether the experiments were based on evidence received in court.' " (*Collins*, *supra*, 49 Cal.4th at p. 246.)

In *Collins*, *supra*, 49 Cal.4th at pages 246 through 247, the Supreme Court described and relied on *Bogle*, *supra*, 41 Cal.App.4th 770, as an example of proper jury experimentation that did not violate the defendant's constitutional confrontation rights. There, the trial court did not disallow the jury's unexpected use of two exhibits, the defendant's set of keys and the murder victims' safe, and correctly found that it was not a prohibited jury experiment. The trial court had compared that situation "to one in which a jury is given a picture and sees something in the picture that adds insight into the case but was not pointed out during testimony." (*Id*. at p. 778.)

Accordingly, in *Bogle*, since the set of keys and the safe had been introduced into evidence, the jury could utilize them in the jury room, because there were credibility

14

issues at stake and "the jury was entitled to determine, from the evidence it was given, the character and extent of the defendant's relationship to the safe.  Trying the keys on the safe was an exercise in that pursuit, not a foray into a new field." (*Bogle*, *supra*, 41 Cal.App.4th at p. 780.)  A jury can reexamine "the evidence in a slightly different context" than was presented at trial, to assist it in reaching a verdict.  (*Id*. at p. 781.)

In *Bogle*, *supra*, 41 Cal.App.4th 770, the court also discussed the concept of diligence of counsel toward the evidence, as illustrated in an out-of-state case discussed by the Supreme Court in *Higgins*, *supra*, 159 Cal. 651.  In that Virginia murder case (*Taylor v. Commonwealth* (1893) 90 Va. 109 [17 S.E. 812] (*Taylor*)), cited approvingly by *Higgins*, the prosecution's evidence included cartridge shells that investigators found at the murder scene, and the defendant tried to rebut the argument that he fired the rifle that produced those shells by offering into evidence the defendant's rifle, which shot the same kind of cartridge shells, but arguing "the marks of the firing pin on the cartridge shells" from the defendant's rifle were "different from the marks on the shells recovered from the scene." (*Bogle*, *supra*, at p. 779.)  Later, when it was learned that the jury, during deliberations, unexpectedly took the rifle apart and determined that someone had tampered with the firing mechanism, no jury misconduct was found.  (*Id*. at pp. 779-780.)

In *Bogle*, the court analyzed the facts in *Taylor*, *supra*, 17 S.E. 812 to conclude that in handling the evidence, "the jury did not invade a new field; it used the evidence at hand to come to its own conclusion concerning the true facts." (*Bogle*, *supra*, 41 Cal.App.4th at p. 780.)  It did not make any difference that the underlying evidence tampering issue had not come to light in open court, because:  " 'A more acute

15

prosecuting attorney might have caused the examination to have been made in open court and thus have demonstrated the trick and fraud, but his failure to do so afforded no ground for overthrowing the verdict of an intelligent and scrutinizing jury which, making its own examination of the evidence admitted to prove or disprove the very fact, discovered that the [rifle] plunger "had been recently tampered with and fixed for the occasion of the trial." ' " (*Bogle*, *supra*, 41 Cal.App.4th at pp. 779-780, quoting *Higgins*, *supra*, 159 Cal. at pp. 658-659.)

Childers contends this case is analogous to *Taylor*, *supra*, 17 S.E. 812, where the jury took the rifle apart and examined it during deliberations. The facts in *Taylor*, however, stand in stark contrast to the facts here. For example, in *Taylor*, the defendant offered the rifle into evidence as well as four cartridges fired by the rifle by one of the defense witnesses to show the jury that those cartridges were struck differently from the two cartridge hulls that the prosecution had put into evidence. (*Id*. at pp. 815-816.) Here, the prosecution offered the gun into evidence, and during closing, Childers's counsel argued the gun was unimportant: "This [gun] is not – for trying to identify who committed this robbery, even if you could tie it to somebody, not that powerful of evidence." Thus, in *Taylor*, *supra*, 17 S.E. 812, according to the defendant, the rifle was central to his theory of defense. At trial here, Childers's counsel argued the gun was not significant.

Also, in *Taylor*, *supra*, 17 S.E. 812, the trial court did not instruct the jury how it "should look at, examine, or consider the gun." (*Id*. at p. 816.) In contrast, the trial court

16

here instructed the jury that it could not manipulate the gun whatsoever and could only view it in the presence of the bailiff. Simply put, *Taylor* is not instructive here.

In addition to concluding *Taylor, supra*, 17 S.E. 812 is distinguishable from the instant matter, we determine that the jury's manipulation of the gun here would have invaded a new field and, thus, any such manipulation would have been improper. (See *Collins*, *supra*, 49 Cal.4th at p. 249; *Higgins*, *supra*, 159 Cal. at pp. 656-657.) Here, there was not sufficient foundation about the gun that would have allowed the jury to draw any helpful inference from manipulating it.

Detective Francisco Brambila testified that he and his partner, Detective Smith, first located the gun in the trunk of the Mercedes. Smith took it out and showed it to Brambila, but Brambila never handled the replica firearm and he could not tell whether what was sticking into the gun was loose or fixed in place. Corey testified that when he took possession of the replica firearm, its barrel was lodged in the gun backwards. He also testified that the barrel could be easily moved in and out. By the time of trial, the two pieces constituting the replica firearm were separated. There was no explanation how or why the pieces were separated. Nor did it matter to either the prosecution or the defense's case. The prosecution argued that the gun belonged to Childers. The defense did not question whether the gun could be put back together or how or why it was taken apart. Instead, the defense commented on the DNA evidence taken off the gun and the fact that evidence could not be linked to Childers. Indeed, Childers's counsel pointed out

17

that the "gun obviously had been handled by several people" and "[t]his gun gets handed around."[5]

Further, the jury's manipulation of the gun would not have proved helpful. If a juror was able to put the gun together into one piece and point the barrel of the gun down without the barrel falling out, this experiment would not have proved or disproved that the gun was the gun used during the carjacking. Neither would the jury be able to draw a helpful inference from manipulating the gun and finding that it could not be put back together or the barrel falls out of the gun when it was pointed down. Perhaps, Childers had altered the gun in some way between the time of the carjacking and his arrest. Or maybe the prosecution's handling of the gun damaged it in some way so that it could not be put back together. On the record before us, there is nothing that provides any clue whether the gun could have been put back together, or, if it could not be put together, explain why that was the case. Given the lack of clarity concerning the condition in which the gun was found, the extent to which it was handled or altered by Childers, Smith, Corey, or some other unknown person, and the questionable chain of custody, no experiment the jury might have conducted would have been within the lines of offered

---

[5] At trial, Childers's challenge to the gun was very different than the defendant's challenge in *Taylor*, *supra*, 17 S.E. 812. Here, Childers's counsel asked the jury to ignore the gun because it was not important. Not only was the rifle significant to the defendant's case in *Taylor*, *supra*, 17 S.E. 812, how the rifle functioned was of vital importance. The defendant's primary theory of defense was that his rifle could not be the same rifle that fired because of the manner it struck the cartridges. The jury apparently was not persuaded and took apart the rifle to test the defendant's theory. Indeed, taking the rifle apart and inspecting it was the *only* way the jury could evaluate the defendant's theory in *Taylor*.

evidence, and any manipulation of the gun during deliberations would have effectively produced new evidence.

Also, we note the stark contrast between Childers's position at trial and his position on appeal regarding the importance of the gun. As discussed above, Childers's trial counsel essentially urged the jury to ignore the gun because it did not prove the identity of the carjacker. Now, on appeal, Childers's argues "[t]he gun is arguably the strongest piece of evidence against [Childers]." We cannot reconcile these diametrically opposed positions. In addition, Childers's argument on appeal ignores the substantial evidence of his guilt.

Childers was found in Rodriguez's car, wearing Rodriguez's hat and carrying Rodriguez's notebook. Childers and his wife, not Poulsom, were associated with the red Nissan from which the carjackers, a man and his female companion, emerged. The red Nissan had been parked near the mobile home Childers and his wife occupied on Ruis's property, and Childers frequently drove it. Two witnesses identified Childers at trial as the carjacker, and they testified Childers's distinctive eyes had left a lasting impression on them. Finally, Childers fled when the officers first tried to arrest him.

In summary, the trial court's decision to not allow the jury to manipulate the gun during deliberations was proper. Any such manipulation would have exceeded the record before the jury and invaded a new field. Moreover, neither the prosecution nor the defense would have had an opportunity to explain the juror's findings based on the manipulation of the gun. Because we determine no error occurred, we conclude the trial court did not violate Childers's Fourteenth Amendment right to due process.

19

## II

### *CHILDERS'S SENTENCING CONTENTION*

Childers's next argues, and the People concede, the trial court erred in imposing a two-year sentence for an out-on-bail enhancement under section 12022.1, subdivision (b) because Childers did not admit to that enhancement and the court did not find the enhancement to be true. The parties, however, disagree on how we should address this error.

Childers maintains that the two-year enhancement must be stricken and the judgment modified to convey same. The People assert the matter should be remanded to allow the court to make the appropriate findings. The People have the better argument.

Childers cites several cases for the proposition that if the fact finder fails to make a finding on an allegation (e.g., a prior felony conviction) then its silence is tantamount to finding the allegation not true. (See *People v. Gutierrez* (1993) 14 Cal.App.4th 1425, 1440; *People v. Garcia* (1970) 4 Cal.App.3d 904, 907.) These cases are not helpful because the court here was not asked to make any factual finding regarding the enhancements. Instead, Childers waived his rights to a jury trial, to confront witnesses, and to present evidence with respect to the enhancements.

In addition, we are not persuaded that *In re Canderlario* (1970) 3 Cal.3d 702 (*Canderlario*), another case cited by Childers, is applicable here either. In *Canderlario*, a defendant convicted of selling heroin admitted having received a prior felony conviction for possession of marijuana. However, the prior conviction was not mentioned in the oral pronouncement of judgment, the minute order of judgment, or the original abstract of

20

judgment. Over a month later, the judge filed an amended abstract of judgment to which the prior conviction had been added. (*Id*. at pp. 704-706.)

Holding the attempted amendment invalid on the ground that failure to include the prior conviction in the judgment could not be presumed an inadvertent clerical error, our high court stated: "Admission of the prior offense . . . does not thereby relieve the court of its responsibility to pronounce judgment finding petitioner guilty of the substantive offense with a prior conviction, and to have such judgment entered in the official records of the court. [¶] Reference to the prior conviction must be included in the pronouncement of judgment for if the record is silent in that regard, in the absence of evidence to the contrary, it may be inferred that the omission was an act of leniency by the trial court. In such circumstances the silence operates as a finding that the prior conviction was not true." (*Canderlario*, *supra*, 3 Cal.3d at p. 706.)

In *Canderlario*, the trial court specifically mentioned defendant's prior conviction "numerous" times during the sentencing hearing. (*Canderlario*, *supra*, 3 Cal.3d at p. 706.) Moreover, the trial court signed the abstract of judgment, which failed to mention the prior, although a box had been provided for such and all other special findings had been noted on the document. (*Id*. at p. 706.) These facts support the Supreme Court's conclusion that the trial court's omission of the prior conviction during sentencing was "an act of leniency." (*Ibid*.) Here, the record does not warrant a determination that the trial court's error was an act of leniency. The trial court sentenced Childers to prison for an additional two years based on the out-on-bail enhancement, specifically mentioning the enhancement during sentencing. The abstract of judgment

21

reflects the same.  Simply, there is nothing in the record even hinting that the trial court here was being lenient in regard to the out-on-bail enhancement.[6]

Instead, the problem we face here is the trial court's failure to obtain Childers's admission of the out-on-bail enhancement.  On the record before us, we can only conclude its failure to do so was inadvertent.  The court specifically mentioned the out-on-bail enhancement and Childers appeared prepared to admit to it:

> "THE COURT:  We've been informed that the jury has verdicts. Before I bring the jury in to take the verdicts, whatever they may be, as to the three charges that I have severed and that we tried before this jury, I bifurcated at the defense request in Count 1 the two l2022.1(b) of the Penal Code section allegations.  That is that on or about April 13th, 2011, Mr. Childers was out on bail on an earlier felony charge.
>
> "And on Count 3 I bifurcated the -- well, there's -- there was a -- an admission that he had been previously legally convicted of a felony. So I severed that.
>
> "So on Counts 1, 2, and 3 I need an admission and a jury waiver on the allegations, plural, that on April 13th, 2011, Mr. Childers was out on bail on an earlier felony charge.
>
> "In addition, I bifurcated the prison prior, the serious felony prior, and the strike prior.  And I need a jury waiver and an admission that the burglary conviction on September 25th, 2001, in case No. SCD155726 in San Diego was a prison prior, was a serious felony prior, and was a strike prior.

---

6      Similarly, Childers's reliance on *People v. Mesa* (1975) 14 Cal.3d 466 and *People v. Molina* (1977) 74 Cal.App.3d 544 is misplaced.  Both cases involved a defendant admitting to a prior felony conviction, but the court failing to mention the admission in orally pronouncing judgment.  (See *Mesa*, *supra*, at p. 471; *Molina*, *supra*, at p. 550.)  In contrast, here, the court specifically mentioned the out-on-bail enhancement when it sentenced Childers, but inadvertently failed to obtain Childers's admission to the enhancement.

22

"Mr. Childers, as to those matters that I have bifurcated, you do have the right to have a jury determine those allegations. You have the right to confront and cross-examine all witnesses against you. You have the right to remain silent. And you have the right to present evidence on your own behalf and have witnesses subpoenaed to testify for you at no charge to you.

"Do you understand you have those rights?

"[Childers]: Yes, sir, your Honor."

However, after properly providing the admonitions and appraising Childers of his rights, including in respect to the out-on-bail enhancement, the trial court inexplicitly omitted a request for an admission from Childers as to the out-on-bail enhancement. The exchange between the court and Childers continued:

"THE COURT: And do you give up those rights and admit that the burglary conviction on September 25th with the court number in the court of San Diego county constitutes a prison prior within the meaning of Penal Code Section 667.5(b) and 668 constitutes a serious felony prior within the meaning of Penal Code Section 667(a)(1), 668 and 1192.7(c), and, finally, constitutes a strike prior within the meaning of Penal Code Section 667(b) through (i), 1170.12, and Penal Code Section 668.

"Yes or No?

"[Childers]: Yes, sir, your Honor.

"THE COURT: People satisfied with the admissions and the waiver?

"[Prosecutor]: Yes, your honor.

"THE COURT: All right. I'll accept the jury waiver and the admissions."

Thus, the court forgot to obtain Childers's admission as to the out-on-bail enhancement and the prosecutor did not notice. Further, the court believed it had

23

obtained the required admission when it sentenced Childers as it added prison time for each of the enhancements, except that it struck the enhancement for the prison prior because the prison prior was based on the same conduct as the prior serious felony.

On the record before us, the only conclusion we can draw is that the court did not intend to be lenient in sentencing Childers in regard to the out-on-bail enhancement and did sentence him as if Childers admitted to that enhancement. Moreover, it appears that Childers was prepared to admit this enhancement, but the court inadvertently failed to ask him to do so. Under this unique fact pattern, we conclude the proper remedy is to reverse the judgment as to the two-year enhancement under section 12022.1, subdivision (b) and remand the matter back to the court to obtain the required admission or make a true finding as to that allegation, if necessary.

Additionally, we are satisfied that remand as to the out-on-bail enhancement only raises no double jeopardy concerns. (Cf. *People v. Barragan* (2004) 32 Cal.4th 236, 259; *People v. Banuelos* (2005) 130 Cal.App.4th 601, 607.)

DISPOSITION

We reverse the judgment to the extent that it includes a two-year enhancement of Childers's prison term based on section 12022.1, subdivision (b). In all other respects, the judgment is affirmed. We remand this matter to the trial court to make the necessary

findings to ascertain if an enhancement under section 12022.1, subdivision (b) is warranted and then to modify the abstract of judgment accordingly.

HUFFMAN, J.

WE CONCUR:

BENKE, Acting P. J.

HALLER, J.